**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank Peter BALISTRIERI, Steve DiSalvo, and Dennis Librizzi,
Defendants-Appellants.**

**Nos. 84–2001, 84–2004 and 84–2012.**

United States Court of Appeals,
Seventh Circuit.

Argued April 26, 1985.

Decided Nov. 12, 1985.

As Corrected Nov. 26, 1985.

Nathan Z. Dershowitz, Alan M. Dershowitz, Dershowitz & Eiger, P.C., New York City, Stephen M. Glynn, Shellow, Shellow & Glynn, S.C., Milwaukee, Wis., for defendants-appellants.

William C. Bryson, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before ESCHBACH and FLAUM, Circuit Judges, and GIBSON, Senior Circuit Judge.[*]

ESCHBACH, Circuit Judge.

Appellants were convicted of conducting an illegal gambling business, conspiracy to conduct such a business, and (except DiSalvo) willful failure to file certain tax forms, and they now appeal. We affirm their convictions.

## I.

The convictions we review today arose out of a lengthy and painstaking government investigation of organized sports gambling activities in Milwaukee, Wisconsin, from 1977 into 1980. The government collected its evidence through physical surveillance, electronic surveillance, warrant-authorized searches, and infiltration by two undercover FBI agents. From this evidence the government developed its theory that the three appellants, along with a number of others, conspired to run a suc-

---

[*] The Honorable Floyd R. Gibson, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

cession of sports gambling businesses during the period. According to the theory, Frank Balistrieri was the owner of the businesses, Steve DiSalvo supervised them, and Dennis Librizzi participated in at least one of them—a basketball bookmaking operation in early 1980.

Appellants, along with many others, were indicted on October 1, 1981. The case was assigned to Judge Robert W. Warren. Balistrieri promptly filed a motion for the disqualification of Judge Warren, the first of several motions in an ultimately successful effort to induce Judge Warren to recuse himself. The case was reassigned to Judge Terence T. Evans for trial, and trial commenced on August 29, 1983. On October 9, 1983, the jury rendered its verdicts.

## II. Frank Balistrieri (No. 84–2001)

Frank Balistrieri was convicted of one count of conspiracy to direct an illegal gambling business, in violation of 18 U.S.C. § 371, two counts of conducting an illegal gambling business, in violation of 18 U.S.C. § 1955, and two counts of failure to file certain tax returns, in violation of 26 U.S.C. § 7203. He was acquitted on one count of conducting an illegal gambling business and four other tax counts. On May 29, 1984, he was sentenced to four years imprisonment and a fine of $4,000 on the conspiracy, four years imprisonment and a fine of $10,000 on one of the § 1955 counts, four years imprisonment and a fine of $4,000 on the other § 1955 count, and one year imprisonment and a fine of $1,000 on each of the two tax counts, with all the sentences of imprisonment to run concurrently.

On appeal, Balistrieri assigns eight errors in the proceedings below.

### A. Recusal of Judge Warren

#### 1. Background

Balistrieri contends that he is entitled to a new trial because Judge Warren, who decided virtually all of the pretrial motions, should have recused himself at the outset. Balistrieri moved four times to disqualify Judge Warren on the ground that Warren, during the period from 1969 into 1971 while serving as the Attorney General of Wisconsin, had formed a firm belief that Balistrieri was the head of the Milwaukee Mafia and had announced that belief and acted on it as Attorney General on numerous occasions.[1]

Judge Warren denied the first three of Balistrieri's recusal motions, holding that the first and second were inadequate to satisfy the statutory standard for disqualification and that the third was untimely. Coupled with the filing of the fourth motion, a week before the start of trial, a Milwaukee attorney, Roland J. Steinle, Jr., issued a press release charging that Judge Warren was personally responsible for an alleged 1969 burglary of his law office and theft of a client file relating to his representation of Balistrieri. Steinle also announced that he intended to file a civil lawsuit against Judge Warren and another person based on that alleged incident.[2] Judge Warren, while categorically denying all these allegations, nevertheless recused himself because he thought that a reasonable person might find an appearance of partiality.

Balistrieri argues that the recusal came too late; because Judge Warren should have recused himself at the start, none of

---

1. In 1980, well before the indictment in this case, Balistrieri filed a motion under Rule 41(e) of the Federal Rules of Criminal Procedure seeking the return of money and property seized by the United States pursuant to search warrants. The motion was assigned to Judge Warren, and Balistrieri moved for recusal on grounds substantially the same as those set forth in his first post-indictment motion and affidavit. Judge Warren denied the motion for recusal in a thorough and thoughtful memorandum opinion. *In re Searches Conducted on March 5, 1980,* 497 F.Supp. 1283 (E.D.Wis.1980).

Balistrieri applied to this court for a writ of mandamus ordering Judge Warren to recuse himself. We dismissed the application as moot when the indictment was returned.

2. Steinle did in fact file his lawsuit, and he lost, both in the district court and in this court. *Steinle v. Warren,* 765 F.2d 95 (7th Cir.1985) (affirming summary judgment for defendants and assessing double costs and damages against Steinle).

his rulings on pretrial motions was valid. We disagree. We do not question Judge Warren's exercise of discretion in recusing himself in the face of Steinle's public activities, but we hold that he was under no obligation to recuse himself earlier.

## 2. The Affidavits

Balistrieri submitted his first motion for recusal on October 26, 1981, shortly after Judge Warren's assignment to the case. The affidavit accompanying the motion set forth various statements and actions attributed to Judge Warren during the period from 1969 through early 1971, when he was Attorney General of Wisconsin. According to the affidavit, Warren believed that Frank Balistrieri was the head of the Mafia family in Wisconsin. Warren allegedly set into operation a systematic program, or "vendetta," designed to ruin Balistrieri and to destroy businesses with which he or his relatives were associated. As a part of this program, Warren moved to dissolve certain Balistrieri-linked corporations for failure to file annual reports, saying that this "crackdown" was an effort to keep the crime syndicate out of legitimate business in Wisconsin. Warren also sought injunctions against four Balistrieri-linked taverns for not having workmen's compensation insurance. On November 28, 1969, fourteen agents (ten from the Attorney General's office) participated in a raid on the Scene, a nightclub which the press described as linked to Balistrieri. In June 1970 Warren objected to the Milwaukee Common Council's granting of liquor licenses to taverns associated with Balistrieri. In an interview after almost two years in office, Warren said the following:

> A characteristic of organized crime ... is that it ignores many of the laws regulating businesses—laws which require annual reports, seller's permits, workmen's compensation insurance and restrict liquor credit.

To get at organized crime in legitimate businesses, the State started a myriad of civil actions against businesses believed to be controlled by organized crime figures.

"We had to start at the bottom with some rather mundane things," Warren said. "For example, we found that the Balistrieri family had not been filing annual corporation reports."

The affidavit also set forth that certain individuals and corporations associated with Balistrieri filed two lawsuits against Warren, the first seeking injunctive relief and damages for the raid on the Scene, and the second seeking damages for the effort to close a certain nightclub for failure to have workmen's compensation insurance. The first suit was voluntarily dismissed, and the second was dismissed on grounds of immunity.

Balistrieri's second motion for recusal was filed on July 20, 1983. It incorporated the previous affidavit and included a new affidavit from one John Forbes.[3] Forbes stated that he was then in the Federal Witness Protection Program, that he was then serving a sentence for burglary, and that over his life he had been charged with a number of crimes and convicted of several. He stated that in 1963 he became acquainted with one Herbert Krusche, a criminal investigator for the Wisconsin Department of Justice. According to Forbes, from 1968 through 1970, during the period when Robert Warren was Attorney General, Krusche asked Forbes to conduct a number of undercover investigations of Frank Balistrieri and persons alleged to be associated with him, in return for help in connection with criminal charges then pending. On several occasions in 1969 and 1970, Forbes related, he wore a body recorder or electronic listening device at Krusche's request and monitored conversations of Frank Balistrieri and of his lawyer,

---

**3.** We have previously had occasion to remark on the affidavit of John Forbes. *See Steinle v. Warren,* 765 F.2d 95, 100 (7th Cir.1985). We there noted that the affidavit did not purport to show where it was executed, the jurat was defective, and the identity of the notary was incomplete. We might also add that there are numerous handwritten strike-outs and revisions of language, and we have no way of knowing who made them or when.

Roland Steinle, among others. Krusche allegedly asked Forbes to break into someone's apartment and plant a bug and to break into the basement of the Kings IV restaurant and plant a bottle of stolen liquor. On one occasion Krusche allegedly asked him to break into Steinle's office and bring back any files he could find on Frank Balistrieri. Forbes stated that he complied with this request and brought back one file. According to Forbes, he met Robert Warren only once, in a meeting with other high officials of the Wisconsin Department of Justice. Forbes stated that he had made a tape of a conversation with someone about fixing a case pending against Forbes, then went with a reporter to the Attorney General's office and turned over the tape. According to Forbes, someone stated that they could not use the tape "because it might be considered illegal or an entrapment or something of the sort." Forbes continued:

> I made a statement to the effect I did not understand why they were concerned about it, in light of the number of times that I wore a bug for Mr. Krushe [sic] and went in places for him. Someone, I think [the Head of the Criminal Division], said "You better not talk about that." [An assistant to Attorney General Warren] then asked if I had declared it on my Wisconsin tax return and kept a record of it. I said "no." [The assistant] said "well, we did." I understood this conversation to mean that I ought not to talk what [sic] I had done for Krushe [sic]. Attorney General Warren was present during this conversation. I do not remember any specific comments made by him. Except about entrapment etcetera. [sic]

Balistrieri filed a third motion for recusal on August 16, 1983, attaching the affidavit of one Terrence Joseph Donley. According to Balistrieri, Donley contacted attorney John Balistrieri on August 11 after having read an article in the previous evening's paper concerning Judge Warren's denial of the previous motion for recusal.

In the affidavit Donley stated that he worked for the Wisconsin Department of Justice from June through September 1970 as an "undercover operative." According to Donley, his immediate supervisors included Robert Warren. In Donley's presence Warren allegedly swore that he was going to get Frank Balistrieri no matter what. Warren was alleged to have said, in substance, "If it's the last thing I do, I'm going to put Frank Balistrieri back in prison for the rest of his life." According to Donley, Warren frequently made statements of his intention to get Frank Balistrieri. Donley stated that a special detail of the Department of Justice under the supervision of Dan Hanley and under instructions from Warren was assigned to the Milwaukee detail on Frank Balistrieri and organized crime, and that it was the purpose of this detail to bring criminal charges against Frank Balistrieri. According to Donley, Warren would get upset if nothing was found. Donley stated that Frank Balistrieri and organized crime were among the top priorities on the Attorney General's budget.

Balistrieri filed his final motion for disqualification on August 22, 1983. It included all the previous motions and supporting documents as well as new affidavits of Frank P. Balistrieri, John J. Balistrieri, and John C. Tucker, Frank Balistrieri's attorney.

In his affidavit Frank Balistrieri stated his belief that Judge Warren had personal bias and prejudice against him. He reiterated the factual allegations of previous affidavits. The only new factual material we find is a paragraph stating that Balistrieri did not previously know Terrence Donley and did not give him anything for his affidavit, and a paragraph stating on information and belief that Judge Warren had said at a recent social gathering that he was delighted to be sitting in judgment in the case because he will have an opportunity to "put Frank Balistrieri away."

The affidavits of John J. Balistrieri and John C. Tucker concerned the circumstances under which Terrence Donley came for-

ward and gave his affidavit. John Balistrieri stated that he had never met Donley before and gave Donley nothing of value for his affidavit. They both stated, in substance, that news reports found in the Milwaukee Public Library confirmed certain statements that Donley had made regarding his background and his position as an informant for the State of Wisconsin during 1970.

### 3. Section 144

Section 144 of the Judicial Code, 28 U.S.C. § 144, requires a judge to recuse himself if a party files a timely and sufficient affidavit that the judge has "a personal bias or prejudice" against him.[4] The law is clear that in passing on the legal sufficiency of the affidavit, the judge must assume that the factual averments it contains are true, even if he knows them to be false.[5] E.g., United States v. Jeffers, 532 F.2d 1101, 1112 (7th Cir.1976), aff'd in part and vacated in part, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). An affidavit is sufficient if it avers facts that, if true, would convince a reasonable person that bias exists. United States v. Baskes, 687 F.2d 165, 170 (7th Cir.1981) (per curiam). The factual averments must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment. Berger v. United States, 255 U.S. 22, 33–34, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1921). They must not, however, be mere conclusions, opinions, or rumors. United States v. Haldeman, 559 F.2d 31, 134 (D.C. Cir.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). They must be stated with particularity, id. at

131, and must be definite as to times, places, persons, and circumstances. Id. at 134. The factual averments must show that the bias is personal rather than judicial, United States v. Patrick, 542 F.2d 381, 390 (7th Cir.1976), cert. denied, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977), and that it stems from an extrajudicial source—some source other than what the judge has learned through participation in the case. United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966).

In view of the requirement that the judge assume that the facts are as stated in the affidavit, the statute, while not quite conferring a right of peremptory challenge, is heavily weighed in favor of recusal. Doubtless recognizing that so powerful an instrument could easily be abused, Congress imposed certain strict limitations and conditions to minimize that possibility. The affidavit must be timely, and a party may file only one in a case. It must be accompanied by counsel's certificate that it is made in good faith. 28 U.S.C. § 144. Courts have recognized that the statute is to be strictly construed, e.g., Rademacher v. City of Phoenix, 442 F.Supp. 27, 29 (D.Ariz.1977), and that a judge is presumed to be impartial, Jeffers, 532 F.2d at 1112, so that a party seeking recusal bears a heavy burden. Baskes, 687 F.2d at 170.

We have not found in our cases any discussion of the standard we apply in reviewing a judge's decision not to recuse himself under § 144. As we read the statute, it was not the intent of Congress to make recusal under § 144 a discretionary determination. The statute states in posi-

---

**4.** Section 144 reads in its entirety:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the

proceeding is to be heard, or good cause shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

**5.** "And the reason is easy to divine. To commit to the judge a decision upon the truth of the facts gives chance for the evil against which the section is directed." Berger v. United States, 255 U.S. 22, 36, 41 S.Ct. 230, 234, 65 L.Ed. 481 (1921).

tive terms that if a party files a timely and sufficient affidavit, *the judge shall proceed no further.* The judge is allowed to pass only on the timeliness and sufficiency of the affidavit, accepting the factual averments as true. Whether the affidavit is timely and sufficient is a question of law, for which the appropriate standard of review is *de novo.*

■ Because of the statutory limitation that a party may file only one affidavit in a case, we need consider only the affidavit filed with Balistrieri's first motion.[6] We must treat the factual averments as true, but not Balistrieri's conclusions as to their significance. When Balistrieri says that Attorney General Warren conducted a "vendetta" designed to ruin him and destroy his businesses, he is drawing conclusions that we are not bound to accept.[7]

■ We take the affidavit to establish that from 1969 through early 1971, during his tenure as Attorney General of Wisconsin, Robert W. Warren believed that Frank Balistrieri was head of an organized crime family in Milwaukee and that he made the statements and took the actions against Balistrieri businesses that the affidavit sets forth, as part of an effort against organized crime. We also take it to establish that certain of Balistrieri's relatives and

business associates brought two lawsuits against Warren as a result of his actions.

The affidavit clearly meets many of the requirements of the law set forth above. There is no doubt that it was timely. While it contains much that is conclusionary, it also contains relevant factual averments, stated with particularity and definite as to times, places, persons, and circumstances. Since the events took place before Judge Warren became a judge, if the affidavit shows bias at all, it is personal rather than judicial, and it stems from an extrajudicial source. The only question, then, is whether the averments that we are bound to accept as true would convince a reasonable person that Judge Warren was biased against Balistrieri at the time the motion for disqualification was made. We hold that they would not.

The most striking feature of the affidavit is that it is confined to events that took place ten to twelve years earlier. Even if the affidavit established that Attorney General Warren was biased against Balistrieri during 1969 through 1971, it contains nothing to show that the bias persisted for over ten years, so as to infect the judgment of Judge Warren in 1981. This does not mean by itself that the affidavit is insufficient, for we know that certain biases tend

---

**6.** The statute says "one such affidavit," and an argument might be made that "such" means "timely and sufficient," a reading that would allow a party to revise or augment an insufficient affidavit and resubmit it. But the cases we have found all say otherwise, and we believe that they are right. *United States v. Anderson,* 433 F.2d 856, 859 (8th Cir.1970) (dictum); *United States v. Hoffa,* 382 F.2d 856, 861 (6th Cir. 1967), *cert. denied,* 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984 (1968); *United States v. International Business Machines Corp.,* 539 F.Supp. 473, 477 (S.D.N.Y.1982).

Balistrieri contends that the one-affidavit rule logically cannot apply where new facts demonstrating bias have come to the attention of a party after a first affidavit has been filed. The one case he cites noted the question but did not decide it. *In re Union Leader Corp.,* 292 F.2d 381, 388 & n. 13 (1st Cir.), *cert. denied,* 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961). But we construe the statute strictly, *see supra,* and its plain language permits a party only one affidavit in a case. Congress could reasonably have

intended to prevent a party from polishing his affidavit through successive submissions, choosing instead to require the party to marshal all his facts the first time. In addition, a party who discovers new evidence of personal bias or prejudice after submitting an affidavit held insufficient under § 144 is not deprived of all means of gaining the judge's recusal. The one-affidavit rule does not apply to motions under § 455.

**7.** Perhaps Balistrieri was only speaking figuratively, but our dictionary defines a vendetta literally as a "blood feud," which is in turn defined as "a feud between the members of different clans or families arising out of a crime of violence (as a killing) committed by a member of one upon a member of the other and requiring a continuing series of alternative retaliations in kind." Webster's Third New International Dictionary (1971). The affidavit does not support such a characterization of Attorney General Warren's actions.

to persist, but the absence of any current evidence of bias is a clear weakness.

Furthermore, the events related in the affidavit bear no relationship to the charges in the indictment. The targets of the enforcement activities of 1969–71 were certain taverns and nightclubs selling alcoholic beverages at retail. The indictment arose out of alleged gambling businesses operating during 1977–80.[8]

Quite apart from the temporal gap, we do not think that the affidavit sufficiently avers facts that show that Attorney General Warren was biased or prejudiced against Balistrieri at the time of the actions related. When a law enforcement professional, be he Attorney General, a prosecutor, or a policeman on the beat, takes action within the scope of his authority against a person, based on a reasonable belief that the person might be violating the law, and supported by whatever degree of probable cause the law may require in the circumstances, such action by itself does not support an inference that the professional harbors some personal bias or prejudice against the person. Law enforcement professionals typically take action against a wide variety of persons during their careers, motivated by nothing more than a desire to carry out the duties of their offices. Even a series of actions against a person according to a plan is not enough in itself to show bias or prejudice; such activity is perfectly compatible with personally disinterested professional motivation.

The negative bias or prejudice from which the law of recusal protects a party must be grounded in some personal animus or malice that the judge harbors against him, of a kind that a fair-minded person could not entirely set aside when judging certain persons or causes. *See United States v. Conforte*, 624 F.2d 869, 881 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980). Satisfactory evidence of bias or prejudice must show this element of personal animus or malice.[9] The case of *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), in which the Supreme Court found the affidavit of certain defendants of German extraction to be sufficient, is an instructive example. The affidavit averred facts that clearly showed, if true, that the judge regarded all Germans with hatred and contempt.

The statements and actions that Balistrieri attributes to Attorney General Warren do not demonstrate, and to our minds do not even suggest, that he was motivated by personal animus against Balistrieri. There is no showing that Warren believed that Balistrieri had done him some personal wrong for which he might have been motivated to seek retribution. There is no showing, as in *Berger*, that Balistrieri is a member of some national, racial, or ethnic group against which Warren was demonstrably prejudiced. True, the affidavit avers that Warren believed that Balistrieri was the head of a Mafia crime family, but there are no intemperate denunciations of the Mafia or other such evidence to show that this belief was alloyed with personal animus. Warren's statement, quoted *supra*, subsection 2, gives a plausible explanation for the approach he took. While it is clear that the name "Balistrieri" came readily to Warren's mind on that occasion, the tone of the statement as a whole is even-tempered and unemotional.[10]

We do not think that the lawsuits filed against Attorney General Warren by rela-

---

**8.** The remoteness of time and circumstance is sufficient to rule out any inference that Judge Warren had a personal stake in the outcome of Balistrieri's case, as a result of his law enforcement activities as Attorney General. If as judge he were assigned to try a case that resulted from those activities, we might infer a motive to vindicate them. Such a motive can be a potent source of bias. But this case arose ten years later, and the affidavit shows no involvement of Judge Warren in the investigations that led to it.

**9.** Of course, if the party claims that the judge is biased because of some personal interest in the case or favoritism to other parties, then animus need not be shown.

**10.** That statement also gives strong reason to think that Balistrieri was not the exclusive target of Warren's effort against organized crime. It mentions a "myriad of civil actions" and refers to Balistrieri only as an example.

tives and business associates of Balistrieri would have created personal animus. Balistrieri himself was not a party to the suits. Both suits were short-lived, and both were dismissed without the granting of any relief. As Attorney General, Warren was immune from personal liability for damages, and there is no indication in the affidavit that he was upset or even inconvenienced by the suits. Meritless lawsuits against public officials for actions taken in the performance of their duties are a fact of public life, and they are generally taken in stride.

The affidavit therefore does not sufficiently allege facts that would convince a reasonable person that Attorney General Warren was motivated by bias or prejudice in his actions against Balistrieri interests in 1969–71, still less than such bias or prejudice persisted for ten years to give Judge Warren "a bent of mind that may prevent or impede impartiality of judgment."

4. Section 455

Section 455 of the Judicial Code, 28 U.S.C. § 455, is the comprehensive federal recusal statute. Section 455(a) requires a judge to disqualify himself in any proceeding in which his impartiality might reasonably be questioned. Section 455(b)(1) requires disqualification when the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts. The remaining subsections of § 455(b) detail several specific circumstances, such as having previously served as a lawyer in the matter in controversy, in which the judge must disqualify himself. Balistrieri contends that Judge Warren should have recused himself under § 455(a) and under the "personal bias or prejudice" part of § 455(b)(1).

4.1. Section 455(b)(1)

■ The phrase "personal bias or prejudice" echoes the language of § 144, and there is authority that the phrase has the same meaning in both statutes. *E.g. United States v. Olander*, 584 F.2d 876, 882 (9th Cir.1978). We see no reason to doubt this; consequently, we shall view judicial interpretations of "personal bias or prejudice" under § 144 as equally applicable to § 455(b)(1). In particular, we think that the interpretation of "personal" as meaning "extrajudicial" applies equally to § 455(b)(1). *Accord In re International Business Machines Corp.*, 618 F.2d 923, 928 (2d Cir.1980).

■ We do not think, however, that § 455(b)(1) reenacts § 144. There is no hint that the strict procedural requirements of § 144 are applicable to § 455(b)(1); indeed, the language of that section strongly suggests otherwise. Section 455(b)(1) is directed to the judge and is self-executing. It requires the judge to disqualify himself if he has a personal bias or prejudice concerning a party. We think that this language imposes a duty on the judge to act sua sponte, even if no motion or affidavit is filed. *Accord United States v. Story*, 716 F.2d 1088, 1091 (6th Cir.1983).

Section 455(b)(1) also dispenses with the requirement that the judge must take all the factual averments of the affidavit as true. The formal and procedural requirements of § 144 are safeguards against its abuse, made possible by the take-as-true requirement. We do not think that Congress, in enacting § 455(b)(1), intended to retain that requirement while doing away with the formal and procedural safeguards it thought necessary in connection with § 144. Accordingly, the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his own personal knowledge.

■ The disqualification of a judge for actual bias or prejudice is a serious matter, and it should be required only when the bias or prejudice is proved by compelling evidence. Accordingly, we think the appropriate standard of proof is the same as for § 144: whether a reasonable person would be convinced that the judge is biased.

■ Section 455 clearly contemplates that decisions with respect to disqualification should be made by the judge sitting in

the case, and not by another judge. It requires the judge to *disqualify himself* when any one of the statutory conditions is met. It makes no provision for the transfer of the issue to another judge. We think that appellate review of a judge's decision not to disqualify himself, when he is asked to do so by a proper and timely motion supported by affidavits and perhaps other evidence, should not be deferential. The motion puts into issue the integrity of the court's judgment. The absence of the requirement that the judge take the factual averments of the moving party's affidavit as true "gives chance for the evil against which the section is directed." *See supra* note 5 and accompanying text. In addition, a judge may be especially reluctant to recuse himself when to do so requires him to admit that his actual bias or prejudice has been proved.[11] Accordingly, we will review decisions against disqualification under § 455(b)(1) *de novo*. We will evaluate the evidence for ourselves, applying the same standard as the district court.

We have held that Balistrieri's first affidavit did not compel recusal under § 144 when all its factual averments are assumed to be true. Consequently, it could not possibly compel recusal under § 455(b)(1); the standard is the same, but the take-as-true requirement no longer operates. We must then consider whether the addition of the remaining affidavits requires a different outcome.[12]

▮ John Forbes's credentials are far from impeccable. He is a career criminal who was serving time for burglary when he gave his affidavit. There is no independent evidence to confirm anything he said in it. But we need not rest on Forbes's doubtful credibility; the fatal flaw in the affidavit is that it does not say that Attorney General Warren knew anything at all about Krusche's alleged activities, still less that he ordered or authorized them.

Balistrieri argues that Forbes's remarks about illegal activities, because they were made in Warren's presence, compel the conclusion that Warren knew of, approved, or ratified these illegal activities. We do not think such a conclusion is compelled. Even if we assume that Forbes actually made the remarks in Warren's presence, nothing shows that Warren heard and understood them, and nothing shows that Warren would have known that Forbes was referring to illegal activities. For an undercover agent to wear a tape recorder or microphone is not, and was not then, per se illegal, and to "go in places" does not necessarily mean to enter them illegally. Because Forbes reports no response or reaction from Warren, his account is perfectly consistent with the conclusion that Warren did not know what Forbes was talking about and did not think it important enough to ask. Forbes was a bit player with a shady past, not a law enforcement professional, and the meeting was focused on something else. But even if Warren knew that Forbes was talking about illegal activity, there is nothing to show that Warren knew who Krusche was, or knew that Krusche was involved in the investigation of Balistrieri, or knew that Forbes's illegal activities were in aid of that investigation.

In sum, Forbes's affidavit is empty of evidence that Warren was actually biased against Balistrieri, even if everything it says is true.

▮ We think that Terrence Donley's affidavit must be taken at a steep rate of discount. Except for the vague statements in the affidavits of John J. Balistrieri and John C. Tucker, to the effect that they had confirmed certain aspects of his story through newspaper accounts, including his claim to have been an informant for the

---

11. The judge need make no such admission under § 144. He may say that while he knows the factual averments to be false, the statute requires him to treat them as true.

12. It might be contended that the three later motions, or some of them, were untimely, coming as they did shortly before the start of trial. But it is currently the law of this circuit that there is no time limit on a motion for recusal under § 455. *United States v. Murphy*, 768 F.2d 1518, 1539 (7th Cir.1985).

Wisconsin Department of Justice in 1971, there is nothing to support or vouch for Donley's credibility. His affidavit includes no biographical information except his claim to have been an informant. There is no affidavit supporting his credibility by a person known to be reliable. Donley is a mystery man, totally without credentials.

Furthermore, the affidavit has gross internal defects. Donley ascribes certain intemperate statements to Warren, but he does not specify the time, place, and circumstances in which they supposedly were made. Donley does say that two other named individuals were present when Warren allegedly made those statements, but no confirming affidavit from either of them is in the record. Donley's affidavit includes unattributed hearsay and conclusions not clearly founded on Donley's own personal, direct observations. For example, it simply does not appear how Donley would have been in a position to speak authoritatively about the budget priorities of the Attorney General.

For these reasons, we conclude that Donley's affidavit may be disregarded.

■ The affidavit of Frank Balistrieri, attached to his final motion for disqualification, includes a report of an alleged remark of Judge Warren at a social gathering. But the report is hearsay and is not specific as to time, place, or source. It has the character of rumor or gossip. We think it too should be disregarded. Balistrieri's affidavit contains no other factual averments not already included in previous affidavits.

We thus conclude that all the affidavits submitted with all the motions for disqualification did not require, when considered together, that Judge Warren recuse himself under § 455(b)(1).[13]

Because the charge of actual bias or prejudice in a judge goes to the heart of the integrity of the judicial process, we have gone a step further in our review and have examined *all* the pretrial orders of

Judge Warren in the record for unmistakable indications that his rulings were affected by bias or prejudice against Balistrieri. We have found no such indications.

We also note that several of the motions denied by Judge Warren, presumably those in which Balistrieri had the greatest interest, were resubmitted to Judge Evans before and after trial, and that Judge Evans made independent rulings on them.

4.2. Section 455(a)

Section 455(a) of the Judicial Code, 28 U.S.C. § 455(a), is not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process. *See* H.R.Rep. No. 93–1453, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6351, 6354–55. It is directed against the *appearance* of partiality, whether or not the judge is actually biased. *See United States v. Murphy*, 768 F.2d 1518, 1540 (7th Cir.1985); *SCA Services, Inc. v. Morgan*, 557 F.2d 110, 116 (7th Cir.1977).

We have previously reviewed the denial of a motion to disqualify under § 455(a) under an abuse-of-discretion standard. *See S.J. Groves & Sons v. International Brotherhood of Teamsters*, 581 F.2d 1241, 1248 (7th Cir.1978). But the analysis of our recent case, *United States v. Murphy*, 768 F.2d 1518 (7th Cir.1985), implies that such denials are not properly reviewable on appeal at all. It is a fundamental principle of appellate review that unless an error affects the substantial rights of the appellant, it is not a basis of reversal. 28 U.S.C. § 2111; Fed.R.Crim.P. 52(a). As we pointed out in *Murphy*, 768 F.2d at 1539, if a judge proceeds in a case when there is (only) an appearance of impropriety in his doing so, the injury is to the judicial system as a whole and not to the substantial rights of the parties. The parties in fact receive a fair trial, even though a reasonable mem-

---

**13.** As part of his second motion for recusal, Balistrieri also moved that, in the event Judge Warren did not recuse himself, a hearing be held before another judge on the issue of recu-

sal. We hold that Judge Warren did not abuse his discretion in denying this alternative motion.

ber of the public might be in doubt about its fairness, because of misleading appearances.

We would hesitate to hold that the denial of a motion to disqualify under § 455(a) is never reversible error if the moving party would be left with no recourse when a judge denies such a motion. We would be depriving ourselves of any means of supervising the administration of § 455(a) in the district courts.[14] But we have held that a writ of mandamus is an appropriate remedy against a judge who refuses to recuse himself when required to do so under that statute. *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir.1985) (granting writ); *SCA Services, Inc. v. Morgan*, 557 F.2d 110, 117–18 (7th Cir.1977) (per curiam) (same). The writ of mandamus is the vehicle by which we may exercise our supervisory powers over the district courts with respect to § 455(a). To require a timely petition for a writ of mandamus as the sole remedy serves another important purpose: that of *preventing* injury to the public perception of the judicial system before it has a chance to occur. If a party is deprived of his substantial rights in a trial before an actually biased judge, the harm can be remedied (though not costlessly) by a new trial before an unbiased judge. But the harm to the public's perception of the judicial system when a judge who appears to be biased proceeds in a case is more difficult to correct. Prevention in such circumstances is clearly preferable to attempts to cure.

■■■■ Accordingly, we hold that when a judge denies a motion to disqualify himself under § 455(a), the moving party's sole recourse is to apply to this court immediately for a writ of mandamus. We therefore shall not review Judge Warren's several denials of Balistrieri's motions under § 455(a).

### B. Hearing Under *Franks v. Delaware*

■■■■ On October 20, 1979, the district court entered an order permitting electronic surveillance at Snug's Restaurant and Leonardo's Pasta House.[15] In support of its motion seeking the order the government submitted a 110-page affidavit of Agent Michael De Marco setting forth evidence that Balistrieri and his associates were engaged in extortion, illegal gambling, and the murders and attempted murders of suspected informants. The electronic surveillance produced evidence that the government intended to introduce at Balistrieri's trial.

After indictment, Balistrieri moved for an evidentiary hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), on the question whether the electronic surveillance evidence should be suppressed because the government made false statements in its affidavit knowingly and intentionally, or with reckless disregard for the truth. On July 6, 1982, the magistrate denied the motion. Balistrieri appealed to the district court, which affirmed the magistrate on October 29, 1982.

In *Franks v. Delaware*, the Supreme Court held that where the defendant makes a substantial preliminary showing that a false statement, knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. *Id.* at 155–56, 98 S.Ct. at 2676. If the defendant proves his contention at the hearing, and if the affidavit's remaining content is insufficient to establish probable cause, then the search warrant must be voided and the fruits of the

---

**14.** We have previously held that we have no jurisdiction to review a judge's order recusing himself, unless the recusal would deprive the litigants of any opportunity to have their case heard at all. Litigants have no protectible interest in having their case heard by one judge rather than another. *Hampton v. City of Chicago*, 643 F.2d 478 (7th Cir.1981).

**15.** These orders were subsequently extended on November 19, 1979, and December 28, 1979.

search excluded. *Id.* at 156, 98 S.Ct. at 2676.

In his motion for a *Franks* hearing, Balistrieri charged that Agent De Marco's affidavit contained a number of knowingly false statements purporting to report statements made by Balistrieri in the presence of undercover agent Gail Cobb and others.[16] Balistrieri claimed that he had never made the statements attributed to him and submitted his own affidavit and the affidavits of other persons alleged to have been present when the statements were supposed to have been made.[17] Each affiant stated that no such statements had been made.

The magistrate held that the statements in question were material; without them the De Marco affidavit would not contain sufficient probable cause. But he denied the motion nevertheless, because Balistrieri had not made a sufficiently substantial preliminary showing that the statements were knowingly and intentionally false or were made with reckless disregard for their truth or falsity. The magistrate reasoned that counteraffidavits by those named as participants in the alleged conversations were not enough, because the agent had a greater incentive to be truthful than the alleged participants. The agent risked the exclusion of all evidence obtained as a result of the surveillance order, while the counteraffiants were subject only to the penalties for false swearing. He concluded that *"Franks"* requires more than a 'swearing contest' before a hearing is mandated."

We are troubled by the magistrate's reasoning, but we need not consider whether Balistrieri made a sufficiently substantial preliminary showing. We hold that the statements Balistrieri challenges were not material; to the extent that the magistrate and the district court held otherwise, their holdings were erroneous.

The statute governing procedures for the interception of wire or oral communications is 18 U.S.C. § 2518. Under the statute the judge, before he may approve or authorize the interception of wire or oral communications, must determine on the basis of the facts submitted by the applicant that, *inter alia:* [18]

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of [Title 18].

The De Marco affidavit reports extensive, detailed information obtained from numerous confidential informants of proven reliability, from surveillance by Special

---

**16.** Specifically, the affidavit asserted that on July 29, 1978, in the presence of the undercover agent, Peter Frank Balistrieri, Joseph Zito, Charles F. Vince, Phillip Joseph Emordeno, and Benjamin "Leftie" Ruggiero, Frank Balistrieri stated, with respect to one August Palmisano, "he called me a name—to my face"; he was "arrogant," and "now they can't find his skin." In the same conversation, it is reported, Frank Balistrieri stated, with respect to one Vincent Maniaci, "he was an informer too." In the context of the affidavit, these statements were support for the proposition that there was probable cause to believe that Balistrieri was responsible for the murder of August Palmisano and the attempted murder of Vincent Maniaci. Also with respect to the July 29 meeting, the affidavit reports that, after the undercover agent was introduced to Frank Balistrieri, Balistrieri pointed a finger at the undercover agent and stated, "I know all about you," "we been looking for you all week—we figured you were the G"— and "We were gonna hit him—we didn't know what this was about—we thought he was the G."

Balistrieri claimed that De Marco's affidavit also misrepresented a conversation among the undercover agent, Steve DiSalvo, and Frank Balistrieri alleged to have occurred on August 27, 1978. According to the warrant affidavit, DiSalvo told the undercover agent that he had tried to talk Frank Balistrieri out of continuing to engage in bookmaking because the bookmakers in Milwaukee were all "stool pigeons." After this discussion, Balistrieri allegedly joined the conversation, and he and DiSalvo purportedly said, in substance, that nobody has lived to be a witness against Balistrieri.

**17.** Steve DiSalvo, Peter Balistrieri, Charles Vince, and Benjamin Ruggiero each provided an affidavit.

**18.** Subsections (b) and (d) of the statute state two additional probable cause determinations that the judge must make. Since the conversations in question were included as evidence of probable cause under subsection (a), we need not consider those other subsections.

Agents, from reports of Special Agents working under cover, and from previous court-authorized wire taps and surreptitious recordings. Disregarding the statements that Balistrieri contends are false, we think that the evidence presented in the affidavit is sufficient to establish probable cause to believe that Frank Balistrieri was the head of an association of individuals devoted to criminal activities in Milwaukee, that he authorized the murders of August Palmisano, August Maniaci, and Vincent Maniaci (the last of whom escaped death when the bomb failed to detonate), that he owned an illegal sports gambling business operated by Sam Librizzi, and that he expanded his vending machine business and took over other businesses by unlawful means.

Probable cause is not proof beyond a reasonable doubt or proof by a preponderance of the evidence. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983). The information in the affidavit need establish only a "fair probability," by practical common-sense standards, that the offenses alleged have been, are being, or will be committed. *Id.* 103 S.Ct. at 2332. The De Marco affidavit amply meets this test without the statements that Balistrieri contends are false.

### C. Speedy Trial Act

Balistrieri contends that he is entitled to a new trial because he was not afforded the minimum thirty days preparation time guaranteed by the Speedy Trial Act. We shall consider this question in connection with the appeal of Dennis Librizzi, on whose arguments Balistrieri relies. *See infra* sec. IV D.

### D. Presence of Unauthorized Person Before Grand Jury

On August 18, 1983, a grand jury returned a superseding indictment, and the district court signed the government's order for dismissal of the original indictment. Balistrieri moved for the dismissal of the superseding indictment, on grounds that the Strike Force attorneys who appeared before the grand jury had no authority to do so. The district court denied this motion.

Rule 6(d) of the Federal Rules of Criminal Procedure reads as follows:

(d) Who May Be Present. Attorneys for the government, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present while the grand jury is in session, but no person other than the jurors may be present while the grand jury is deliberating or voting.

Rule 54(c) defines "attorney for the government" to include the Attorney General, an authorized assistant of the Attorney General, a United States Attorney, and an authorized assistant of a United States Attorney.

John Franke and Mark Vogel conducted the grand jury proceedings leading to the superseding indictment. Franke and Vogel were not assistant United States Attorneys but "special attorneys" employed by the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice. They were assigned to assist the United States Attorney for the Eastern District of Wisconsin in investigating and prosecuting this case. Thus, if they were "attorneys for the government" within the meaning of Rule 6(d), it was because they were "authorized assistants of the Attorney General" under Rule 54(c).

Balistrieri argued below that Franke and Vogel were not "authorized assistants of the Attorney General" because they did not have the authorization provided for by 28 U.S.C. § 515(a), which reads:

(a) The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States attorneys are authorized by law to conduct, whether or not he is a resident

of the district in which the proceeding is brought.

In response, the government submitted letters of authorization and other documents evidencing the authority of Franke and Vogel. A letter dated November 7, 1979, from Philip B. Heymann, Assistant Attorney General for the Criminal Division of the Department of Justice, to Mark J. Vogel, contains the following text:

> As an attorney for the Government employed full time by the Department of Justice and assigned to the Criminal Division, you are hereby authorized and directed to file informations and to conduct in the Eastern District of Wisconsin and any other judicial district any kind of legal proceedings, civil or criminal, including grand jury proceedings and proceedings before United States Magistrates, which United States Attorneys are authorized to conduct.
>
> You may file a copy of this letter with the Clerk of the District Court to evidence this authorization.

Balistrieri concedes in this court that under our holding in *Infelice v. United States*, 528 F.2d 204 (7th Cir.1975), this letter was sufficiently specific to establish Vogel's authority to appear before the grand jury.

The letter to Franke was from Stephen S. Trott, Assistant Attorney General for the Criminal Division, and bore a date of August 23, 1983, five days after the return of the superseding indictment. It read:

> This letter is to evidence your appointment as an attorney for the Government, employed full time by the Department of Justice, and assigned to the Criminal Division. Since March 15, 1982, you have been and continue to be authorized and directed to file informations and to conduct in the Eastern District of Wisconsin and any other judicial district any kind of legal proceedings, civil or criminal, including grand jury proceedings and proceedings before United States Magistrates, which United States Attorney are authorized to conduct.
>
> You may file a copy of this letter with the Clerk of the District Court to evidence this authorization.

Balistrieri contends that this letter is not a letter of authorization; it simply recites that Franke *had* been appointed an attorney for the government and that since March 15, 1982, he had been authorized and directed to appear before the grand jury. He points out that the letter does not recite how, where, or by whom that authorization or direction was made. An unsworn letter merely stating that authorization was previously given, he contends, is not adequate proof of authorization.

Section 515(a) was enacted in 1906 in order to overrule legislatively *United States v. Rosenthal*, 121 F. 862 (C.C.S.D.N.Y.1903), which held that only the United States Attorney for the district or one of his assistants could present a matter to the grand jury. *United States v. Morris*, 532 F.2d 436 (5th Cir.1976); *In re Persico*, 522 F.2d 41 (2d Cir.1975). According to the report of the Judiciary Committee in favor of passage,

> [t]he purpose of this bill is to give to the Attorney General, or to any officer in his Department, or to any attorney specially employed by him, the same rights, powers and authority which district attorneys [United States Attorneys] now have or may hereafter have in presenting and conducting proceedings before a grand jury or committing magistrate.

H.R.Rep. No. 2901, 59th Cong., 1st Sess. 1–2 (1906), *as quoted in Morris*, 532 F.2d at 440.

While the principal purpose of the statute was to empower the Attorney General and his special employees to appear before grand juries and magistrates, Congress also wanted to protect the treasury from excessive expenses and unwarranted claims incident to the appointment of special counsel and to preserve the traditional role of district (now United States) attorneys as the primary representatives of the government before grand juries. *Persico*, 522 F.2d at 60. The restrictive features of the statute are directed to those ends; there is

no evidence that Congress intended those features as safeguards for the benefit of those whose indictment might be sought. Consequently, § 515(a) has generally been constructed liberally in favor of the validity of indictments. *Id.* at 61.

Letters appointing or commissioning special attorneys have been extensively attacked as overly broad, and in virtually every case the appointment has been upheld. In *Infelice v. United States,* 528 F.2d 204 (7th Cir.1975), we noted cases holding that the failure to specify the statute under which the special attorney was to act was not fatal, that the failure to specify the names of the persons to be investigated or prosecuted was of no consequence, and that no reason need be stated for the appointment. *Id.* at 206–07. *See also Persico,* 522 F.2d at 62–64.

Balistrieri, of course, does not contend that Franke's letter of appointment is overbroad but that it is totally absent. We must confront two questions that are apparently of first impression: (1) can a special attorney be validly appointed under § 515(a) without a letter of appointment or written commission, and if so, (2) can his authority be proved by a letter from the Assistant Attorney General for the Criminal Division certifying that he has been authorized from a certain date in the past?

■ We do not know whether Franke's letter of authorization was never issued or was issued and lost. If such a letter is essential to the authorization, it would make a difference. On that assumption, if the letter was never issued, there was never any authorization, but if it was issued and later lost, there was authorization that might be proved by other evidence. In the absence of evidence to the contrary, we shall assume that no letter was issued. Nevertheless, we hold that a letter of authorization is not essential to the validity of an appointment under § 515(a). The statute does not in terms require written au-

thorization, and the general policy of liberally construing the statute in favor of the validity of indictments inclines us not to add such a provision to it.

We might think otherwise if the commissions of special attorneys had to be precisely and narrowly drawn, meticulously tailor-made for carefully limited purposes. In that event it might be too difficult to reconstruct the authority of a special attorney without a written commission, and too easy to mold the authority afterwards to fit the special attorney's activities. But the law clearly favors broadly drawn commissions, relying on other institutional safeguards to hold special attorneys in check. *See Persico,* 522 F.2d at 51–52.

■ The question now becomes whether Franke was in fact authorized to appear before the grand jury that returned the superseding indictment. We are persuaded that the evidence submitted by the government is sufficient to establish that he was authorized. The letter of August 23, 1983, stating that Franke has been authorized since March 15, 1982, is from the Assistant Attorney General for the Criminal Division, and Balistrieri makes no challenge to that official's authority to make such appointments as an original matter.[19] Indeed, Vogel's letter, which Balistrieri no longer contests, is also from the Assistant Attorney General for the Criminal Division. That the letter does not say how, where, or by whom Franke was originally authorized appears to us immaterial. That the letter is not notarized also appears immaterial; it is clearly in the standard form used by the Criminal Division for letters of authorization, and Balistrieri does not contend that the signature is a forgery. The letter to Vogel was not notarized.

If there were countervailing evidence or even any reason to suspect that Franke really was not authorized when he appeared before the grand jury, we might require harder evidence. But there is noth-

---

19. The letter is actually signed by John C. Keeney, Deputy Assistant Attorney General, "pursuant to Order No. 725–77, dated May 12, 1977." We presume that this order delegates the au-

thority to appoint special attorneys or at least to sign the appointment letters. Vogel's letter was similarly signed by a Deputy Assistant Attorney General.

ing to suggest that the absence of an original letter of authorization was anything more than an administrative oversight.

Furthermore, there is evidence in the record to corroborate Franke's prior authorization. On March 17, 1982, Franke executed a duly notarized Appointment Affidavit on Standard Form 61, showing the position to which he was appointed to be Special Attorney and the date of appointment to be March 15, 1982. The affidavit includes, among other things, Franke's oath of office.

Of course, we do not commend the government's procedure with regard to Franke's authorization. Clearly, contemporaneous letters of authorization are preferable to retrospective proof, however convincing. But under the unusual circumstances of this case, we hold that Franke's authorization was sufficiently proved and that the superseding indictment may stand.

### E. Sufficiency of the Evidence

Balistrieri contends that the evidence was insufficient to sustain his convictions. The standard we apply is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984).

### 1. Count 2—The 1977 Football Season

■ To convict Balistrieri of Count 2, the government had to prove that he conducted, financed, managed, supervised, directed, or owned a gambling business in 1977 that (i) was a violation of the law of Wisconsin, (ii) involved five or more persons, and (iii) had a gross revenue of $2,000 in any single day. 18 U.S.C. § 1955.

We proceed from the premise that the government proved that Salvatore "Sam" Librizzi operated a football gambling business during the 1977 football season that met conditions (i), (ii), and (iii).[20] Balistrieri does not contest this premise. The government's theory was that Balistrieri was the owner of the business. In support of this theory the government offered the testimony of Joseph Pistone, a Special Agent of the Federal Bureau of Investigation, who worked undercover as part of the Strike Force investigation. Pistone testified that on Sunday, August 27, 1978, he participated in a conversation with Frank Balistrieri and Steve DiSalvo at the Peppercorn Lounge in Milwaukee,[21] during which

> Frank Balistrieri said that Steve DiSalvo was in charge of his bookmaking operation, and he was looking—Frank Balistrieri was looking for an individual to oversee the day-to-day operation, because the person that was running it last year, by the name of Sam, did not tend to business and wasn't doing a good job and he was looking for someone that he could trust to run the daily, the day-to-day operation for the upcoming football season.

We think that a reasonable jury could have believed this testimony and could have inferred from it, beyond a reasonable doubt, that Frank Balistrieri owned a football gambling business in 1977 that was operated by someone named "Sam."

There was further evidence that "Sam" was Sam Librizzi. FBI agents observed Sam Librizzi meeting in a hospital parking lot with Steve DiSalvo on three separate occasions in October 1976. Following one of these meetings, DiSalvo was observed driving directly to Frank Balistrieri's house. In September 1978 Balistrieri was shown photographs of one of these meetings during a grand jury proceeding. Gail Cobb, a Special Agent for the FBI who had also worked undercover, testified that in a

---

**20.** Sam Librizzi was convicted of operating such a business and did not appeal. An account of the evidence can be found in *United States v. Balistrieri,* 577 F.Supp. 1532 (E.D.Wis.1984).

**21.** For the background of this conversation see *United States v. Balistrieri,* 577 F.Supp. 1532, 1537–38 (E.D.Wis.1984).

conversation among Frank Balistrieri, Peter Balistrieri, and Steve DiSalvo just after the proceeding,

> Peter said to Steve, "You got a problem," and then Frank told him that they had pictures of Steve at the hospital—meeting at the hospital, and Steve gave the name of the hospital which I don't recall, and they said, "Yes, they got pictures of you there where you picked up the money."

Cobb also testified that in this conversation Frank Balistrieri mentioned Sam Librizzi by name as the person with whom DiSalvo had met. A reasonable jury could have believed all of this testimony and could have inferred from it, beyond a reasonable doubt, that the "Sam" to whom Balistrieri referred in the Peppercorn conversation was Sam Librizzi, and thus that Balistrieri was the owner of Sam Librizzi's football gambling business in 1977.[22]

Balistrieri argues that because Sam Librizzi's meetings with DiSalvo were for unknown purposes and took place in 1976, there was no evidence tying Balistrieri to Sam Librizzi's 1977 gambling operation. We disagree. Given the admissions in the Peppercorn conversation, the jury needed only evidence from which it could find beyond a reasonable doubt that the "Sam" Balistrieri referred to was Sam Librizzi, and we think the evidence provided was sufficient for that purpose.[23]

2. Count 3—The 1979 Football Season

▉ Count 3 charged Balistrieri with violating 18 U.S.C. § 1955 during the 1979 football season. The evidence consisted primarily of the materials obtained in a warrant-authorized search of Balistrieri's home on March 5, 1980, together with expert testimony as to the significance of those materials. They included a "charting sheet" and "bet sheets" of the kind used in a bookmaking operation. These sheets were written in Sam Librizzi's hand. The expert testified that they related to the 1979 football season.

The government also introduced a recorded conversation between Frank Balistrieri and Sam Librizzi that took place on January 10, 1980. Librizzi delivered a large sum of money to Balistrieri. They talked about people who had not paid and about the level of betting on certain games. In the expert's opinion Librizzi was reporting to Balistrieri part of the previous season's wagering activity. The expert also expressed his opinion that Frank Balistrieri was the owner or a partner in the gambling business run by Sam Librizzi. We think that this evidence is sufficient to enable the jury to conclude that Balistrieri owned a football gambling business during the 1979 football season that violated Wisconsin law.

According to the expert, the sheets seized in the search of Balistrieri's house reflected the acceptance of more than $47,000 in bets on October 14, 1979. This is sufficient to prove that the business had a gross revenue of $2,000 in a single day.

The difficult question is whether the government proved that five or more persons were involved. The government's expert testified that the evidence showed that Balistrieri, Sam Librizzi, John Pisciune, Carl Micelli, and a partner of Micelli known as "Matches" were involved. Pisciune's involvement was shown by his recorded conversation with Sam Librizzi and by the fact that some of the betting sheets bore the initials "J.P." at the top, which, according to the expert, identified a writer for the operation. The expert identified Micelli and "Matches" as writers on the basis of remarks in the Balistrieri-Librizzi conversa-

---

**22.** In addition, there was evidence that Balistrieri owned Sam Librizzi's gambling business during the 1979 football season. *See* next subsection. This evidence provides further support for the conclusion that the "Sam" to whom Balistrieri was referring in the Peppercorn conversation was Sam Librizzi.

**23.** In a footnote to his brief, DiSalvo adopts Balistrieri's argument concerning the sufficiency of the evidence on Count 2. While our holding does not expressly include DiSalvo, we agree with him that he and Balistrieri were similarly situated. We have examined the evidence as it applies to DiSalvo, and we conclude that it was sufficient to support his conviction on Count 2.

tion together with the fact that they had been writers in previous years.

■■■ Balistrieri argues that Pisciune was acquitted and so cannot count as one of the five, and that Micelli and "Matches" were the same person. But the jury could have acquitted Pisciune through lenity while believing him guilty; his acquittal does not bar the use of evidence of his involvement against Balistrieri. *See United States v. Powell,* — U.S. —, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984). Furthermore, even if Pisciune was not "J.P.," the evidence showed that someone identified by the initials "J.P." was a writer, and he may be counted.

There was evidence to show that Micelli had a partner, that both were writers for the business and occupied the same office, and that both reported wagers to Sam Librizzi, who recorded them in an account labeled "Matches." The jury could have believed this evidence; whether "Matches" was the nickname of Micelli or his partner is irrelevant.[24]

■■■ Balistrieri argues that even if the jury could have found that five people were involved and that gross revenues exceeded $2,000 on at least one day, there is nothing to show that five people were involved on such a day. But the statute does not require proof that five people were involved on a $2,000 day, and we have found no case that so holds, certainly not *United States v. Gresko,* 632 F.2d 1128, 1133–34 (4th Cir. 1980), cited to us by Balistrieri.

We conclude that the evidence was sufficient to support the jury's verdict on Count 3.

### 3. Count 1—The Conspiracy Count

Count 1 charged Balistrieri with conspiring to commit offenses in violation of 18 U.S.C. § 1955, beginning on or before September 1, 1977, and continuing until April 18, 1980. As overt acts the indictment alleged the conduct charged in Counts 2, 3, and 4,[25] as well as several specific incidents of gambling activity.

■■■ The federal crime of conspiracy has two basic elements: an agreement between two or more persons to commit a crime, and an overt act in furtherance of the illegal agreement. 18 U.S.C. § 371. Balistrieri does not contend that no agreement was proved, and indeed there was evidence to show that Balistrieri agreed with Sam Librizzi as early as 1977 that Librizzi would operate Balistrieri's sports gambling business. Balistrieri argues rather that because the evidence in support of Counts 2 and 3 is insufficient, and because he was acquitted on Count 4, no overt act was proved. But we have held that the evidence in support of Counts 2 and 3 is sufficient, and his acquittal of Count 4 does not require reversal of the conspiracy conviction. *See United States v. Isaksson,* 744 F.2d 574 (7th Cir.1984) (government not required to prove all overt acts charged; proof of one can suffice).[26]

Balistrieri argues that even if there was evidence of a conspiracy involving Balistrieri, the evidence shows multiple conspira-

---

**24.** In addition, there was evidence that Steve DiSalvo was involved. In an intercepted phone conversation on October 26, 1979, Balistrieri complained to Esther Ridgway about the losses he had suffered in his bookmaking operation. At one point he said, "I hollered at him, I hollered at Steve, I'm through hollering." From other evidence that Steve DiSalvo had supervised Balistrieri's gambling business in earlier years the jury could have inferred that the "Steve" Balistrieri referred to was Steve DiSalvo.

**25.** Count 4 charged Balistrieri with conducting a gambling business in violation of § 1955 during the 1980 basketball season. The jury acquitted him of this charge.

**26.** We note that Balistrieri might have been found guilty of conspiracy, even if he had been acquitted of Counts 2, 3, and 4. Proof of conspiracy to violate 18 U.S.C. § 1955 does not require proof that the conspirators consummated the violation, i.e., committed acts satisfying every material element of the predicate crime. It is enough to prove that one of them did an overt act to effect the object of the conspiracy. The indictment alleges that on certain specified dates Sam Librizzi and others engaged in sports bookmaking and gambling by accepting wagers in excess of $2,000. Proof of one such allegation would suffice as proof of an overt act.

cies at best and not the single conspiracy charged in the indictment. He contends that these conspiracies involved different persons and different periods of time, specifically the 1977 football season, the 1979 football season, and the 1980 basketball season. We think the jury could have inferred that there was a single ongoing conspiracy.

Continuity of a conspiracy does not require perfect continuity of membership. Some members may join or drop out during the course of single conspiracy. *See United States v. Lynch,* 699 F.2d 839, 843 (7th Cir.1982). While the Balistrieri gambling business may have employed different writers at different times, the evidence shows that the same core conspirators were involved throughout: Balistrieri, Steve DiSalvo,[27] and Sam Librizzi. *See United States v. Varelli,* 407 F.2d 735, 742 (7th Cir.1969) (single conspiracy may have small group of core conspirators, with others joining and terminating their relationship at different times).

The fact that the gambling business operated during three distinct sports seasons does not establish that there were multiple conspiracies. The essential question is the nature of the agreement. *Id.* While there might have been separate agreements for each sports season, the evidence here tends to show a single ongoing agreement to operate a gambling business.

Furthermore, the absence of direct evidence of gambling operations in 1978 does not require a finding that the conspiracy terminated at some time after the 1977 football season and that a new conspiracy was formed for the 1979 season. Continuity of a conspiracy does not require continuity of activity directed toward the object of the conspiracy. A lull may be part of the agreement. In addition, the Peppercorn conversation, *supra,* is evidence that the conspiracy was ongoing in 1978. After complaining that "Sam" had

not been performing well, Balistrieri offered to Joseph Pistone the job of running the day-to-day bookmaking operation for the 1978 football season.

#### 4. Counts 5 and 7—The Tax Counts

Counts 5 and 7 charged that Balistrieri had failed to file certain tax forms, as required by law. These forms are required of persons in the business of accepting wagers on sporting events. Balistrieri's sole argument is that the insufficiency of the evidence to show that he was engaged in a gambling business requires his acquittal of these counts. Because we have held that the evidence was sufficient, we need not go further.

In sum, we hold that the evidence was sufficient to sustain all of Balistrieri's convictions.

### F. Prejudicial Publicity

At the conclusion of the government's case in chief the court ruled on the admissibility of certain evidence under the co-conspirator exception to the hearsay rule and on defendants' motions for a directed verdict of acquittal. The court held, out of the presence of the jury, that the existence of a conspiracy was proved by a preponderance of the independent evidence and that the government had adduced sufficient evidence to warrant continuation of the case. The next morning the Milwaukee Sentinel published a report of the previous day's proceedings against the headline, "JUDGE SAYS EVIDENCE IS AGAINST BALISTRIERI."

Judge Evans did not poll the jury to determine whether any jurors had read or heard about the headline. Instead, he explained to the jury that he had ruled the day before on legal issues concerning the admissibility of evidence and on other motions. He told the jurors that if they had been exposed to publicity concerning those rulings suggesting that he had any view concerning the appropriate verdicts in the case, they should totally disregard such

---

**27.** The evidence does not show that Steve DiSalvo was involved during the 1980 basketball season.

publicity, and that he had formed no opinion as to the guilt or innocence of the defendants. Balistrieri contends that this way of dealing with the prejudicial publicity was reversible error.

■■■ In *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969), we set forth the procedure to be followed in this circuit when prejudicial publicity is brought to the court's attention during a trial.

> [T]he court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further.

It is clear that the trial court did not follow this procedure, and it would have been better if it had done so. But failure to follow the procedure is not automatically reversible error. *See United States v. Taylor*, 569 F.2d 448, 454 (7th Cir.), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978). The ultimate inquiry is whether there is any substantial likelihood that the defendants were denied a fair trial. After considerable reflection, we have concluded that there is not.

■■■] Throughout the trial the court cautioned the jurors not to discuss the case with anyone and not to read any newspaper accounts of the case or listen to television or radio broadcasts concerning it. He gave this instruction at the conclusion of proceedings the day before the headline appeared. His instruction to the jury on the morning the headline appeared carefully avoided informing the jury of the content of the headline.[28] He did not even state specifically that his remarks concerned a particular news report. Thus we think that any juror who had not read or heard of the headline would not have acquired any prejudicial information from the court's own comments.

The more difficult question is whether any prejudicial effect of the headline on a juror who read or heard of it would have been cured by the court's instruction. While we may not always hold that a carefully drawn instruction is an adequate remedy for prejudicial publicity when the court fails to follow the *Margoles* procedure, we think in this case that it was. The instruction was given promptly on the morning that the headline appeared. Judge Evans was in a uniquely strong position to counter the effect of the headline, for it concerned what he himself had said. We think that any juror who saw the headline would have given overriding weight to Judge Evan's own immediate account of the previous day's rulings and his disavowal of any opinion as to the guilt or innocence of any defendant.

We would have greater difficulty approving of the procedure followed if, as is more common, the prejudicial publicity had provided information that had been or would be excluded from evidence. *See, e.g., United States v. Trapnell*, 638 F.2d 1016, 1023 (7th Cir.1980). The trial judge will not in general be able to contradict the illicit information authoritatively; he may be able to do little more than tell the jury to disregard it. When illicit information stands unrebutted in a juror's mind, it becomes more important to determine by the *Margoles* procedure whether the juror will be able to disregard it.

We thus conclude that any error in the trial court's failure to apply the *Margoles* procedure was harmless, given the unique facts of this case.

### G. The 302 Reports

Balistrieri contends that he was prejudiced by the FBI's destruction of earlier

---

**28.** The instruction was tendered by counsel for Sam Librizzi, and the court read it verbatim to the jury.

versions of two "302" reports. We shall consider his arguments in connection with the appeal of Steve DiSalvo, who raises similar issues. *See infra,* sec. III B 3.

### H. Testimony Regarding Organized Crime and Agent's Fear

■ Balistrieri contends that his conviction must be reversed because of the repeated prejudicial injection of allegations of organized crime and agent's fear. In support, he mentions three episodes in the testimony of two Special Agents who worked undercover during the task force investigation. Agent Cobb testified that he gave Benjamin Ruggiero (an unindicted co-conspirator) money because in Milwaukee "to go into business and stay in business you had to pay the mob money." Agent Pistone refused to answer the question whether he lived in New York or California during 1978. Agent Pistone also identified Benjamin Ruggiero as a "made member" of the Bonanno family of New York City, and Mike Sabella as Ruggiero's captain in the Bonanno family.

Each of these incidents prompted a motion for a mistrial by defendants, which the court in each case denied. Balistrieri renewed his objections in his motion for a new trial, which the court also denied.

The trial court is in a much better position to judge the prejudicial effect of testimony than we are. Our review is consequently deferential. We do not think that the trial court abused its discretion in denying the motions for a mistrial and for a new trial. The reference to the "mob" and to the Bonanno family both involved Benjamin Ruggiero, who was not a defendant. Balistrieri was not directly implicated. The references were isolated and incidental to the issues being tried. It is most unlikely that these references would have induced the jury to find Balistrieri guilty because they suggested that he was associated with the "mob" or the Bonanno family, or because they inflamed the jury with anti-mob sentiment.

Similarly, Pistone's refusal to say where he lived in 1978 seems to us a trivial and isolated incident. There was no testimony and no remark of counsel or the court in the presence of the jury to the effect that Pistone refused to answer the question because he feared for his life. That the jury would have drawn such a conclusion is speculation.

We find no reversible error in the three episodes or in the trial court's handling of them.

### III. Steve DiSalvo (No. 84–2004)

Steve DiSalvo was charged with one count of conspiracy to conduct an illegal sports bookmaking operation in violation of 18 U.S.C. § 1955 (Count 1) and with three substantive violations of § 1955: during the 1977 football season (Count 2), during the 1979 football season (Count 3), and during the 1980 basketball season (Count 4).[29] The court dismissed Count 4 at the conclusion of the government's case in chief. The jury acquitted DiSalvo of the charge in Count 3. He was convicted on Counts 1 and 2 and was sentenced on May 30, 1984, to four years imprisonment on each count, to be served consecutively.

### A. Recusal

■ Independently of Balistrieri, DiSalvo submitted a timely motion seeking Judge Warren's recusal. The motion included an affidavit by Robert Sosnay, an attorney who represented DiSalvo as plaintiff in a 1976 civil suit, *DiSalvo v. Milwaukee Police Department,* 428 F.Supp. 108 (E.D.Wis.1976). The affidavit stated that when Sosnay appeared before Judge Warren to request a temporary restraining order on behalf of DiSalvo, the judge disqualified himself because the Attorney General's office had investigated DiSalvo while he was Attorney General. No further grounds for recusal were presented.

DiSalvo's motion for recusal does not mention the statute on which he relied. We shall assume that he sought recusal under 28 U.S.C. § 144, § 455(a), and § 455(b)(1). We noted *supra,* sec. II A 4.2,

---

**29.** These are the same offenses with which Balistrieri was charged. DiSalvo was not charged with any tax violations.

that the denial of a motion to recuse under § 455(a) is not reversible error because it does not affect the substantial rights of the party. We also held *supra* that the standards for recusal under § 144 and § 455(b)(1) are the same: whether a reasonable person would be convinced that the judge was biased or prejudiced. Our standard of review under both statutes is *de novo*. Because § 144 requires us to assume that the factual averments of the affidavit are true, we need consider only § 144. If recusal is required under § 144, there is no need to go further; if it is not required, then it could not possibly be required under § 455(b)(1).[30] *See supra* sec. II A 4.1.

We assume that in 1976 Judge Warren recused himself from a civil case in which DiSalvo was the plaintiff, because the Attorney General's office had investigated DiSalvo while he was Attorney General. The reason given shows that Judge Warren recused himself because he thought there might be an appearance of impropriety if he presided. His recusal cannot reasonably be taken to be founded on actual bias or prejudice, unless we suppose that he intended to imply that he harbored bias or prejudice against anyone investigated by his office. Such an implication is so far-fetched that we reject it.

Since a prior recusal for the appearance of bias against a party says nothing about any actual bias or prejudice in the judge, it does not constitute evidence that the judge is actually biased or prejudiced against that party in a case that arises five years later. The affidavit is therefore insufficient.

We conclude that Judge Warren was not required to recuse himself from presiding over DiSalvo's case.

### B. Documents

1. Cross-Examination of Agent Potkonjak with Telex

 The contact agent for Cobb and Pistone was Special Agent Michael Potkon-

jak, who from time to time sent telex reports to Washington with recent news from the investigation. Potkonjak testified that he prepared and sent a telex based on information reported to him by Cobb and Pistone covering the three-day weekend at the end of August 1978 that culminated in the Peppercorn conversation.

The defense learned of the existence of the telex before trial and sought its disclosure. On order of the court, the government produced a portion of it and submitted the entire telex to the court, where it was put under seal. It has not since been unsealed.

In the cross-examination of Cobb the defense sought to suggest that Cobb had fabricated the Peppercorn conversation. To rebut this suggestion, the government offered Potkonjak's testimony and the previously disclosed portion of the telex. The court permitted counsel for DiSalvo and Balistrieri to review the entire telex but would not permit counsel for DiSalvo to cross-examine Potkonjak on the undisclosed portion. DiSalvo's counsel in this appeal, who was not his trial counsel and has not seen the full telex, contends that DiSalvo's confrontation rights may have been abridged under the principles of *United States v. De Gudino*, 722 F.2d 1351, 1354 (7th Cir.1983), and *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). He seeks the entry of an order unsealing the full text of the telex and permitting supplemental briefing.

We have examined the full text of the telex and have concluded that unsealing and supplemental briefing are unnecessary.[31] We agree with the district court that the highly sensitive nature of the hitherto undisclosed information contained in the telex justifies keeping it under seal. The undisclosed information concerns mat-

---

**30.** This assumes, as is the case here, that the evidence in support of recusal is found entirely in the affidavit submitted under § 144.

**31.** The district court transmitted a copy of the complete telex to us at our request, and we have put it under seal in this court pending the decision of this appeal.

ters as to which Potkonjak did not testify on direct examination and which do not pertain to the charges in this case. Those matters are thus beyond the scope of cross-examination. Fed.R.Evid. 611(b). To the extent that the district court has discretion to permit inquiry into additional matters, we hold that the court did not abuse its discretion in refusing to allow cross-examination on the undisclosed portion of the telex. The motion to unseal is denied.

## 2. Confrontation of Cobb with Telex

When the government called Potkonjak and offered most of the disclosed portion of the telex into evidence, Agent Cobb had already testified and had been excused. The defense moved for an order that the government make Cobb available or reveal his whereabouts so that he might be subpoenaed. The court denied the motion, and Cobb was not recalled. DiSalvo contends that the court's refusal to permit confrontation of Cobb with the telex violated his rights under the Sixth Amendment, the Jencks Act, and *Brady v. Maryland.*

The Jencks Act and *Brady* arguments are easily disposed of. The Jencks Act requires the government to produce, but only on motion of the defendant after the witness has testified on direct examination, any statement of the witness it may have relating to the subject matter as to which the witness has testified. 18 U.S.C. § 3500. There are two independent reasons why no Jencks Act violated occurred. First, the government had already produced the portion of the telex in question before Cobb testified. Second, the telex is not a statement of Cobb's. The act defines "statement [of a witness]" as (1) a written statement made by the witness and signed or otherwise adopted and approved by him, (2) a substantially verbatim contemporaneous recording, or a transcription thereof, of an oral statement made by the witness, or (3) a statement made by the witness to a grand jury. The telex fits in none of these categories. Cobb was a source of information for the telex, but Potkonjak composed it, and not as a transcription of a recording of Cobb's words but as a summary of highlights.

*Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), requires the government to produce, on request, any exculpatory information it may have. As noted above, the government had already produced the relevant portion of the telex before Cobb testified. Consequently, there was no *Brady* violation.

It would appear that for the same reason there was no violation of the Confrontation Clause, either. The defendants had the telex when Cobb testified; they could have examined him on it then. But DiSalvo makes the following argument: the defense learned that Cobb was a source of the information in the telex only after Potkonjak testified. During Cobb's testimony the defense had no reason to suspect that Cobb had anything to do with the telex. Thus the need to cross-examine Cobb with the telex became apparent only after Potkonjak's testimony.

We think that the defense had every reason to suspect that Cobb had something to do with the telex. The defense knew that Cobb was one of the two undercover agents who had made contact with Balistrieri and his associates and that the events described in the telex were covered in Cobb's testimony on direct examination. We think the true reason why the defense did not attempt to confront Cobb with the telex is well stated in DiSalvo's brief:

> [T]he telex itself cut both ways. It was exculpatory because it did not include numerous details about the Peppercorn conversation. Yet the fact that it mentioned the Peppercorn conversation at all tended to lend credibility to the agents' testimony.

Not to confront Cobb with the telex was apparently a tactical decision based on the defense's judgment that to put it into evidence might do more harm than good. We think the defense chose to run the risk of the government's later introduction of the telex. Because DiSalvo could have confronted Cobb with the telex but chose not

to, no violation of his rights under the Confrontation Clause occurred.

*United States v. De Gudino*, 722 F.2d 1351 (7th Cir.1983), relied on by DiSalvo, does not compel a contrary result. In that case the trial court refused to allow the defense to question the witness about a previous arrest. We emphasized that defense counsel must be permitted to expose the facts from which the factfinder can draw inferences relating to the reliability of the witness and to make a record from which to argue why the witness might be biased. *Id.* at 1354. But we also noted that the trial judge has discretion to control and limit cross-examination. *Id.* The crucial question on appellate review, we said, is whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and bias. *Id.* Finding that the jury did have sufficient information and that the witness's arrest had minimal value in demonstrating bias, we affirmed the conviction.

In *De Gudino* a specific piece of information about the witness's background known to the defense was kept from the jury. *Cf. Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (violation of Confrontation Clause to keep from jury information about witness's previous adjudication as juvenile delinquent). There is no corresponding feature in the instant case. The edited telex was in evidence, and the defense could use it to argue to the jury that Cobb fabricated some parts of his testimony. We cannot see that the defense's inability to cross-examine Cobb on the telex deprived the jury of any known information at all. Thus the test question of *De Gudino* does not really apply in these circumstances. Of course, the jury was denied whatever information it would have received from the cross-examination of Cobb on the telex, but the decision whether to permit cross-examination for whatever it might produce is one that is left to the sound discretion of the trial court. Because Potkonjak testified that the telex gave only the highlights of Cobb's report and not necessarily in Cobb's own words, because DiSalvo points to no specif-

ic information relevant to the assessment of Cobb's credibility that was kept from the jury, and because the actual cross-examination of Cobb was sufficiently thorough to enable the jury to make a discriminating appraisal of him as a witness, we cannot find that the trial court abused its discretion in not permitting Cobb to be recalled for cross-examination on the telex.

3. Missing 302 Reports

If an FBI agent acquires information as to which he may later be called to testify, FBI regulations require that he make a written report of the information on form FD–302. Agent Cobb authored several such "302s" during the period in 1978 when he worked undercover in the investigation of Balistrieri. One of them covered the "Peppercorn conversation" of August 27, 1978 ("Peppercorn 302"), *see supra* sec. II E 1; another covered the conversation in Snug's Restaurant on September 13, 1978, when Balistrieri talked about his appearance before the grand jury ("Snug's 302"). *See id.* Cobb dictated the Peppercorn 302 on August 30, 1978, and the Snug's 302 on September 18, 1978. They were promptly transcribed. Under normal procedures, a transcribed report is returned to the author, who either initials it as correct or sends it back for correction, the process being repeated until he initials it. The record is unclear whether Cobb had initialed the Peppercorn or Snug's 302 before he left Milwaukee for another assignment in December 1978, though Cobb testified that he thought he had not.

At some time during 1979, Agent Potkonjak, the case agent for the Balistrieri investigation in the Milwaukee office of the FBI, reviewed the results of the investigation in which Cobb had participated and sent several of Cobb's 302s back to Cobb with some questions. Cobb reviewed the 302s and dictated some changes. His secretary transcribed the changes, each on a separate sheet of paper (the "change sheets"). Each of the more than twenty change sheets identified the 302 to be changed, as well as the page and paragraph, and sup-

plied the language as it ought to read, without specifying how the passage originally read. Cobb apparently sent the change sheets to Potkonjak, who had new 302s (or perhaps just replacement pages) typed in October of November 1979. The originals were discarded, and the revised 302s were sent back to Cobb for initialing. The government produced both revised 302s, bearing Cobb's initials, as well as the change sheets for the Peppercorn 302, before trial.[32] But the government could not produce either the original 302s or any tape or other document that showed how the 302s originally read.

Cobb made changes to each of the Peppercorn and Snug's 302s. Only one of the changes to each document is pertinent here. One change sheet shows as revised language to paragraph 1 of page 5 of the Peppercorn 302: "... Frank advised that Sam, the individual he had last ..."; the other shows as revised language to the last paragraph of page 2 of the Snug's 302: "... Sam Libirzzi [sic], the Sam mentioned previously, in the parking lot...."

The pertinent passage of the Peppercorn 302, after incorporation of the change, here italicized, reads as follows:

> *FRANK* [Balistrieri] *advised that SAM, the individual he had last* year who worked right under DI SALVO running the day-to-day book, did not tend to business; and therefore, FRANK did not want him running the day-to-day book for this coming football season.

The pertinent passage of the Snug's 302, with the revised language incorporated, reads:

> PETER [Balistrieri] and FRANK [Balistrieri] advised DI SALVO that the Government had photographs of him, DI SALVO, meeting *SAM LIBRIZZI, the SAM mentioned previously, in the parking lot* of a Milwaukee hospital.

These passages correspond to the parts of Cobb's and Pistone's testimony that constituted the principal evidence against Balistrieri and DiSalvo on Count 2 of the indictment. Both changes involve references to "Sam" or "Sam Librizzi," the only such explicit references attributed to Balistrieri or DiSalvo by the undercover agents.

Balistrieri and DiSalvo contend that the government's failure to produce the original 302s violated their rights under the Jencks Act, *Brady v. Maryland,* and the Confrontation Clause. They take the position that in 1979 the government fabricated the evidence linking them to Sam Librizzi's gambling business in 1977, either by making up the entire Peppercorn and Snug's conversations or by inserting spurious references to "Sam" or "Sam Librizzi" into them. According to their theory, the government covered its tracks by destroying the original 302s that lacked such references, contrary to express FBI regulations.

■ If Cobb had initialed the original 302s, then discarding them was a violation of FBI regulations.[33] But a violation of agency regulations not prohibited by the Constitution or federal law is not reversible

---

**32.** The government did not find the change sheets for the Snug's 302 until after Cobb and Potkonjak had testified. *See* next subsection.

**33.** Section 10–22.4 of the FBI's Manual of Administrative *Operations and Procedures* (1978) reads as follows:

> Errors discovered in FD–302 after initiating and filing, whether substantive or nonsubstantive, shall be corrected on the original only by typewriter, if possible, with no notations. Corrections on copies may be made in ink. If necessary to retype the FD–302 because of the extent of correction, then the original of the retyped page should be retained, along with the first original in the field office file.... If corrections [are] neces-

sary on FD–302 before initialing and filing, then these are made as in other communications. Only the approved original FD–302 initialed by the Agent is to be retained in this case.

Potkonjak contended that this regulation requires retention of the original only if extensive corrections are made. But we think it requires retention of the original whenever it is retyped and assumes (erroneously) that a 302 will not be retyped unless the corrections are extensive. The obvious purpose of the retention requirement is to preserve a record of how the 302 originally read. The need for such a record remains the same, whether the changes are extensive or not, as this case amply demonstrates.

error. *See United States v. Bastanipour,* 697 F.2d 170, 174–75 (7th Cir.1982), *cert. denied,* 460 U.S. 1091, 103 S.Ct. 1790, 76 L.Ed.2d 358 (1983).

■■■ Whether initialed or not, the original 302s were statements of Cobb's within the meaning of the Jencks Act, 18 U.S.C. § 3500(e)(2). The government's failure to produce them was thus an apparent violation of the act. But this is not a case in which the government has producible documents that it chooses not to produce despite a court order. The government failed to produce the documents because they had previously been destroyed, discarded, or otherwise lost. We think the loss was inadvertent, or at worst, negligent. There is no evidence that the government acted in bad faith to deliberately place these documents beyond the reach of the defendants. Thus the sanctions of § 3500(d) are not automatically required.

Congress does not appear to have contemplated how the Jencks Act should apply when documents that would otherwise have been producible are destroyed in good faith. One approach, entirely consistent with the statute, would be to hold that documents destroyed in good faith cease to be documents in the possession of the government and are therefore not producible under the act. But we need not go so far, for we have previously recognized a narrower exception that can be readily adapted to the circumstances of this case. In *United States v. Batchelder,* we held that an agent's handwritten notes of his meetings with the defendant need not be retained after they have been typed. 581 F.2d 626, 635 (7th Cir.1978), *rev'd on other grounds,* 422 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). In *United States v. Bastanipour,* we held that an agent's handwritten draft of a report need not be retained after the report has been typed. 697 F.2d at 174. Both of these holdings were based on the premise that the types-

cript contained all the information in the handwritten materials.

These holdings do not apply straightforwardly to the instant case. Nevertheless, we know the crucial questions: whether the original 302s contained accounts of the Peppercorn and Snug's conversations paralleling those of the revised 302s, and if so, whether they contained references to Sam Librizzi. And we know that these questions were fully ventilated before the jury during the trial. Agent Cobb's testimony supported affirmative answers to both.[34] Cobb and Potkonjak were vigorously cross-examined by numerous defense counsel on the contents of the original 302s and the circumstances under which they were changed. Agent De Marco was thoroughly examined on his use of the original Peppercorn 302 in preparing his affidavit of October 20, 1979, *see supra* sec. II B, with special emphasis on the question why it contained no mention of that part of the Peppercorn conversation that dealt with gambling. We think the question of the contents of the original 302s was in effect submitted to the jury as a question of fact relevant to its determination of the guilt or innocence of Balistrieri and DiSalvo on Count 2. The fact that the jury returned verdicts of guilty shows that it credited the testimony of the government's witnesses and rejected the defense's theory of later fabrication. Implicit in its determination was a finding that the original 302s were as Cobb testified. Otherwise, it would have had to find that Cobb had lied on the stand, and the integrity of the government's evidence would have been undermined. We shall not disturb this finding, based as it is on the jury's assessment of the credibility of the government's witnesses.

But if the original 302s were as Cobb testified, it is clear that their production would not have aided the defense, for the entire argument that these conversations, or at least the references to Sam Librizzi,

---

**34.** Cobb testified that the only change he had made to the relevant passage in the Peppercorn 302 was to delete the word "Librizzi," because

he remembered that Balistrieri had used only the first name "Sam."

were later fabrications, would have been decisively refuted. The defense was better off without the originals, if that is what they contained.[35] Thus, in the unusual circumstances of this case, where we are confident that the trier of fact, having been fully informed as to the facts and having heard the thorough cross-examination of witnesses and the arguments of counsel, has made a determination as to the pertinent contents of the missing documents, and where its determination implies that the documents would not have been helpful to the defense, we hold that the government's failure to produce them because they were destroyed or discarded in good faith does not violate the Jencks Act.

For similar reasons, the nonproduction of the original 302s did not violate *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Original 302s containing accounts of the Peppercorn and Snug's conversations with references to Sam Librizzi would have been neither exculpatory nor impeaching. Thus the government had no duty founded on the Due Process Clause to produce them.

Finally, the nonproduction of the original 302s did not violate the Sixth Amendment right of confrontation. The right of confrontation is violated when the court imposes an unwarranted restriction on the scope of cross-examination but not when the government fails to produce certain documents that the defense might find useful for cross-examination. The nonproduction of documents amounts to a constitutional violation only if it deprives the defendants of a fair trial under the Due Process Clause. *See United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985).

We caution the FBI to use greater care in preserving potential Jencks Act material. It is better to err on the side of unneces-sary retention than to risk the loss of crucial testimony at trial.

### 4. Late Production of Change Sheets

During the trial, but after Cobb and Pistone had testified, the government found in its files two change sheets applicable to the Snug's 302. One is irrelevant; the other made a change in the account of Balistrieri's remarks. We recounted the content in the preceding subsection. DiSalvo contends that the late production of this change sheet denied him his right to confront Cobb and Pistone with it. He argues simply that cross-examination of Cobb and Pistone with the change sheet would have affected the jury's determination of their credibility, on which the government's case rested.

The trial judge has considerable discretion to place restrictions on the scope of cross-examination once the right to confront witnesses has been substantially exercised. *United States ex rel. Scarpelli v. George,* 687 F.2d 1012, 1014 (7th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). In this case the right to confront Cobb and Pistone had been substantially exercised; they were vigorously cross-examined by various defense counsel. Cobb in particular was cross-examined on the Peppercorn change sheet. We think that the marginal value of further cross-examination on the Snug's change sheet would have been so slight that the trial judge did not abuse his discretion in refusing to recall Cobb and Pistone.

DiSalvo also suggests that the late production of the Snug's change sheet violated his rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Assuming that the change sheet was exculpatory, we hold that its late production was not reversible error. The relevant test, we think, is a variant of the test of materiality set forth in *United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 81

---

**35.** Because we accept the jury's finding, we need not speculate as to whether Balistrieri and Di-Salvo would have been prejudiced by the nonproduction of the original 302s *if* they had not contained accounts of the Peppercorn and Snug's conversations, or if those accounts contained no mention of Sam Librizzi.

L.Ed.2d 481 (1985).[36] The late production of exculpatory evidence during trial is reversible error only if there is a reasonable probability that, had the evidence been timely disclosed to the defense, the result of the trial would have been different. There is no such reasonable probability in this case. We noted above that the change sheet would have had only slight, if any, additional value in the cross-examination of Cobb and Pistone. Furthermore, the defense was able to use the change sheet as additional support for the argument that the references to Sam Librizzi had been fabricated by the FBI.

5. Confrontation of Pistone with Medical Records

■ At trial Pistone testified that Balistrieri offered to let him take over the bookmaking operation in Milwaukee but that he declined, giving as his reason that he did not want to spend the whole winter in Milwaukee. When asked what the true reason was, he testified that his wife had been in a serious automobile accident and that he could not have been away from home for the entire football season.

DiSalvo finds a discrepancy between Pistone's trial testimony and his testimony to the grand jury, produced to the defendants under the Jencks Act. According to DiSalvo, Pistone told the grand jury that he declined the offer because the weather in Milwaukee was too cold. The defense unsuccessfully sought access to the hospital and medical records of Pistone's wife, in order to test the truthfulness of Pistone's claim at trial that his wife was seriously injured. The theory was that if Pistone's explanation based on his wife's injury should prove false, this would cast doubt on his testimony that the offer was ever made.

According to the only evidence we find in the record, and the very source cited by DiSalvo for his paraphrase of Pistone's testimony, Pistone testified that he told the grand jury that he "didn't want to spend the winter in Milwaukee." Transcript at 1113. That explanation is perfectly compatible with the explanation he gave at trial. In his trial testimony he simply went a step further and gave the reason why he did not want to spend the winter in Milwaukee: his wife had been seriously injured and needed his assistance. There is nothing on which to base even a reasonable suspicion that Pistone may have been lying in testifying that his wife had been seriously injured. The trial court did not abuse its discretion in denying the request for medical records.

C. Out-of-Court Statement of Co-Conspirator

■ DiSalvo challenges the admission into evidence of several out-of-court statements of Benjamin Ruggiero, an unindicted co-conspirator. He contends that their admission violated his rights under the Confrontation Clause of the Sixth Amendment, because the government did not show that Ruggiero was unavailable to testify.

Five courts of appeals have held that the admission of out-of-court statements of a co-conspirator under Rule 801(d)(2)(E) of the Federal Rules of Evidence without a showing that he is unavailable does indeed violate the Confrontation Clause.[37] But

---

**36.** While the opinion of the Court in *Bagley* did not cover this point, five justices agreed that "evidence is material [under *Brady*] only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at ——–——, 105 S.Ct. at 3384–85. Thus the distinction between general and specific requests drawn in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), has apparently been overruled.

**37.** *United States v. Inadi*, 748 F.2d 812, 819 (3d Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2653, 86 L.Ed.2d 271 (1985); *United States v. Massa*, 740 F.2d 629, 639 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); *United States v. Lisotto*, 722 F.2d 85, 88 (4th Cir.1983), *cert. denied*, 466 U.S. 905, 104 S.Ct. 1682, 80 L.Ed.2d 157 (1984); *United States v. Arbelaez*, 719 F.2d 1453, 1459–60 (9th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984); *United States v. Peacock*, 654 F.2d 339, 349 (5th Cir.1981), *cert. denied*, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983).

this court is not among them. We have steadfastly held that the Confrontation Clause does not require a showing of the co-conspirator's unavailability before his out-of-court statements may be admitted under Rule 801(d)(2)(E).[38]

The courts that side with DiSalvo rely on *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In *Roberts* the Court said the following:

> The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. *In the usual case* ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.

448 U.S. at 65, 100 S.Ct. at 2538 (emphasis added). Later the Court said:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause *normally* requires a showing that he is unavailable.

*Id.* at 66, 100 S.Ct. at 2539 (emphasis added).[39]

We have emphasized the phrases "in the usual case" and "normally" because they show that the Court recognized that the rule admits of exceptions. Indeed, the one exception expressly noted by the Court, *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), *see* 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7, involved the admissibility of an out-of-court statement of a co-conspirator under a state rule of evidence.

DiSalvo has not shown us why the out-of-court statements of co-conspirators that are admissible under Rule 801(d)(2)(E) should not generally be exceptions to the rule of *Roberts*. The right of confrontation, while fundamentally important, is not absolute. *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). It may be balanced against society's interest in law enforcement in the context of criminal conspiracies, which are clandestine by their nature, and in which the leaders typically take extraordinary measures to cover their tracks. We have made it clear that we will not overrule our previous cases on this question unless we are given very persuasive reasons or a command from a higher authority. *United States v. Williams*, 737 F.2d 594, 610 (7th Cir.1984), *cert. denied,* ⎯ U.S. ⎯ ⎯, 105 S.Ct. 1354–55, 84 L.Ed.2d 377 (1985). DiSalvo has not given us those very persuasive reasons.

The question is now before the Supreme Court in *United States v. Inadi*, 748 F.2d 812 (3d Cir.1984), *cert. granted,* ⎯ U.S. ⎯, 105 S.Ct. 2653, 86 L.Ed.2d 271 (1985). Until the Supreme Court tells us otherwise, we shall continue to apply our precedents. *See United States v. Molt*, 772 F.2d 366, 369 (7th Cir.1985) (similar result).

### D. Jury Instructions

One of the requirements of 18 U.S.C. § 1955, the statute DiSalvo was convicted of violating (Count 2), is that the gambling business that the defendant is accused of conducting must be in violation of state law. The court read the following instruction to the jury:

> The illegal gambling business charged in Counts 2, 3 and 4 must, as I said, violate the laws of the State of Wiscon-

---

**38.** *United States v. Chiavola*, 744 F.2d 1271, 1275–76 (7th Cir.1984); *United States v. Williams*, 737 F.2d 594, 610 (7th Cir.1984), *cert. denied,* ⎯ U.S. ⎯, 105 S.Ct. 1354–55, 84 L.Ed.2d 377 (1985); *United States v. Xheka*, 704 F.2d 974, 987 n. 7 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Regilio*, 669 F.2d 1169, 1176 (7th Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982).

**39.** It might be argued that *Roberts* applies only to hearsay statements, whereas under the federal rules the out-of-court statements of co-conspirators are not hearsay. The answer is that the classifications of the federal rules are not binding for constitutional analysis. The Confrontation Clause is potentially implicated whenever the government seeks to introduce an out-of-court statement of a third person into evidence against a defendant.

sin, in that regard the following state laws are applicable, a section which makes it a crime to operate a place of gambling or share in its earnings, a section that prohibits receiving, recording or forwarding a bet for profit, a section that prohibits keeping any gambling records for profit and a section which prohibits the use of any property as a gambling place.

DiSalvo contends that this instruction was erroneous, because it permitted the jury to reach a nonunanimous verdict. Some jurors could have found that the gambling business violated one of the state laws mentioned, some another. DiSalvo did not make this objection below; consequently it is waived on appeal. Under Rule 52(b) of the Federal Rules of Criminal Procedure we may notice plain error affecting substantial rights, even though it was not brought to the attention of the court below. But there was no error, plain or otherwise.

Rule 31(a) of the Federal Rules of Criminal Procedure requires jury verdicts to be unanimous. Difficulty arises when the defendant is charged with violating a statute that prohibits a number of distinct acts. If the jury is told only to determine if the defendant violated the statute, some jurors could find him guilty because he performed one of the prohibited acts, while others might find him guilty because he performed another. The appearance of unanimity would be misleading, because the jury may have reached no agreement as to what the defendant actually did. *See United States v. Gipson,* 553 F.2d 453, 456–59 (5th Cir.1977).

No such possibility arises in this case. If some jurors thought that the gambling business violated one Wisconsin statute and some thought that it violated another, this does not mean that the two groups would have found DiSalvo guilty of different crimes, each requiring a separate *actus reus.* It is the gambling business that must be found to violate Wisconsin law, not DiSalvo personally. As long as the twelve jurors all found that the gambling business that DiSalvo was charged with conducting

violated Wisconsin law, they were unanimous on that material element of the crime, even if they differed among themselves as to which precise provision of Wisconsin law it violated.

DiSalvo contends that in its instructions to the jury the court should have defined "gambling place" under Wisconsin law, given an instruction tendered by Balistrieri stating the theory of the defense, instructed on the unreliability of extrajudicial statements, and instructed that the intentional destruction of evidence could be considered affirmative evidence of weakness of the government's case. We have given careful consideration to his arguments, and we have concluded that they are without merit.

## IV. Dennis Librizzi (No. 84–2012)

Dennis Librizzi was charged with one count of conspiracy to conduct an illegal sports bookmaking operation in violation of 18 U.S.C. § 1955 (Count 1), with one substantive violation of § 1955 during the 1980 basketball season (Count 4), and with three counts of failure to file certain tax forms (Counts 6, 10, and 11). He was convicted on all counts. He was sentenced on June 4, 1984, to imprisonment for a year and a day on Count 1 and to three years probation on the remaining counts, on condition that he pay a fine of $15,000 during the probationary period.

### A. Constitutionality of 18 U.S.C. § 1955

Librizzi contends that § 1955 violates the implied equal protection provision of the Fifth Amendment because it selects for criminal prosecution citizens of the United States who happen to live in states where it is unlawful to operate a private gambling business. We think that this contention was definitively refuted in *United States v. Hawes,* 529 F.2d 472, 477–78 (5th Cir.1976). *Accord United States v. Sacco,* 491 F.2d 995, 1003 (9th Cir.1974) (en banc); *United States v. Smaldone,* 485 F.2d 1333, 1343 (10th Cir.1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974).

Librizzi also makes arguments questioning the wisdom of a federal law prohibiting illegal gambling, in view of the increasing

prevalence of legalized gambling in the United States. He should direct these arguments to Congress.

### B. Sufficiency of the Evidence

■ Librizzi maintains that the evidence was insufficient to support his conviction on the conspiracy count, because there was no evidence to show that he ever even talked to Balistrieri and DiSalvo. He concedes that the evidence shows that he engaged with his brother Sam Librizzi in operating a bookmaking enterprise through the basketball season of 1980, and he does not challenge the sufficiency of the evidence in support of his conviction on Count 4, charging him with managing a gambling business in violation of 18 U.S.C. § 1955.

It is not clear from the evidence when Dennis Librizzi may have joined the conspiracy, but we think the evidence is sufficient to show that he had joined it by the 1980 basketball season. One may join a conspiracy after it has formed, *United States v. Ras*, 713 F.2d 311, 314 (7th Cir. 1983), and one may belong to a conspiracy without knowing all the co-conspirators. *United States v. Castro*, 629 F.2d 456, 464 (7th Cir.1980). One joins a conspiracy if one agrees with a conspirator to participate in the project or enterprise that is the object of the conspiracy and knowingly acts in furtherance of that object. That one has not met or agreed with every conspirator is immaterial. It is clear that the bookmaking business operated by Sam Librizzi was the ongoing object of the conspiracy charged in the indictment. Dennis Librizzi joined that conspiracy by agreeing with Sam Librizzi to participate and by actually participating in that business during the 1980 basketball season. Librizzi does not contend that the evidence is insufficient to show his knowing participation in the business, and the agreement can be inferred from the participation. The evidence is therefore sufficient.

### C. Juror's Association with FBI Agent

■ After trial it came to light that one of the jurors, Douglas Plinska, had played on a softball team with one James McDermott, an FBI agent, during the preceding softball season. During voir dire, the jurors had been asked whether they knew or were related to any past or present employee of the FBI, and juror Plinska did not respond affirmatively.

Librizzi moved for a new trial. At a hearing on the motion Judge Evans questioned Plinska at length. When asked when he first learned that McDermott was an FBI agent, Plinska replied that he was "fairly certain" that it was at an awards banquet held after the trial was over, though "[i]t could have been before." When asked to comment on the charge that he was deliberately untruthful in voir dire, he replied that he did not know an FBI agent when the question was asked. Judge Evans denied the motion for a new trial, finding that while Plinska knew McDermott before the trial, he did not socialize with him, and he did not know that McDermott was an FBI agent until the awards banquet after the trial.

We will reverse the denial of a motion for a new trial only for an abuse of discretion. Judge Evans's decision hinged on his finding that Plinska did not know that McDermott was an FBI agent until after trial. If that finding is correct, then clearly there was no abuse of discretion. We must accept the trial judge's findings of fact unless they are clearly erroneous. We find no clear error here.

To be sure, Librizzi submitted the affidavit of a third member of the softball team, who averred that at the awards banquet he had heard Plinska tell McDermott that he (Plinska) had answered "No" when asked by the judge if he knew any member of the FBI. Librizzi also submitted the affidavit of the owner of the restaurant that sponsored the softball team, who averred that at an organizational meeting of the team in the spring of 1983, he was introduced to McDermott as an FBI agent within the sight and hearing of Plinska. But these averments are fully consistent with Judge Evans's finding that Plinska did not know until the awards banquet that McDermott was an FBI agent. That finding turned principally on Judge Evans's assessment of

Plinska's credibility when he testified under oath. Judge Evans was in a much better position to judge Plinska's credibility than we are, and we find no reason to hold that his determination was clearly erroneous.

## D. SpeNN dy Trial Act Violation

■ On August 11, 1983, two weeks before the start of trial, one of the defendants moved to dismiss the indictment because of the unauthorized presence of an FBI agent in the grand jury room. In order to cure the defect, the government dismissed the original indictment and secured a superseding indictment (substantially the same as the original), which was returned on August 18, 1983. The defendants moved for a continuance, but the motion was denied. The trial commenced on August 29, 1983.

Librizzi contends that under § 3161(c)(2) of the Speedy Trial Act, 18 U.S.C. § 3161(c)(2), defendants were entitled to thirty days from their arraignment on the superseding indictment until the start of trial. Section 3161(c)(2) reads as follows:

> (2) Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.

This provision clearly applies to the original indictment. Section 3161(d)(1) makes it clear that it applies as well to a superseding indictment charging the same offense or an offense based on the same conduct or

arising from the same criminal episode (as this one did), provided that the original indictment was dismissed upon motion of the defendant.[40] But the original indictment was not dismissed "upon motion of the defendant." While a defendant moved for dismissal, the court never acted on the motion. The government by its own action dismissed the indictment, with leave of the court. Thus it would appear that the governing provision is § 3161(h)(6), which excludes from the seventy days allowed for the start of trial any time elapsing between the date of dismissal of the indictment upon the motion of the attorney for the government and the date of first appearance on the superseding indictment.[41] From the fact that this time is excluded, it follows that the superseding indictment does not restart the seventy-day clock, as does § 3161(d)(1), and there is no reason to suppose that it would trigger a new thirty-day minimum, either. This was the conclusion we reached in *United States v. Horton,* 676 F.2d 1165, 1170 (7th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983), the facts of which are indistinguishable from the facts of the case at bar.

If *Horton* is still good law, it is dispositive. Librizzi urges us to overrule *Horton,* because it erroneously assumes that whether a superseding indictment triggers a new thirty-day minimum depends on which party is responsible for the dismissal of the original indictment. According to Librizzi, Congress intended for § 3151(c)(2) to govern all reindictments but improvidently placed it within subsection (c), where it is

---

**40.** Section 3161(d)(1) reads as follows:

(d)(1) If any indictment or information is dismissed upon motion of the defendant, or any charge contained in a complaint filed against an individual is dismissed or otherwise dropped, and thereafter a complaint is filed against such defendant or individual charging him with the same offense or an offense based on the same conduct or arising from the same criminal episode, or an information or indictment is filed charging such defendant with the same offense or an offense based on the same conduct or arising from the same criminal episode, the provisions of subsection (b) and (c) of this section shall be

applicable with respect to such subsequent complaint, indictment, or information, as the case may be.

**41.** Section 3161(h)(6) reads as follows:

(6) If the information or indictment is dismissed upon motion of the attorney for the Government and thereafter a charge is filed against the defendant for the same offense, or any offense required to be joined with that offense, any period of delay from the date the charge was dismissed to the date the time limitation would commence to run as to the subsequent charge had there been no previous charge [is excludable].

apparently brought into play only by § 3161(d)(1) and not by § 3161(h)(6).[42] He maintains that it is arbitrary to restart the thirty-day minimum automatically when the original indictment is dismissed on motion of the defendant but not when it is dismissed on motion of the government; the defendant is as much in need of a thirty-day period for new preparation in the one case as in the other. The Court of Appeals for the Ninth Circuit agrees with Librizzi, holding that § 3161(c)(2) guarantees "that the defendant is not forced to trial less than thirty days from the date on which the defendant first appears *on the indictment on which the defendant ultimately goes to trial.*" *United States v. Harris,* 724 F.2d 1452, 1455 (9th Cir.1984) (emphasis in original). This approach is clearly inconsistent with *Horton,* and at least one other court of appeals has rejected it. *United States v. Rush,* 738 F.2d 497, 510–11 (1st Cir.1984) (thirty-day limit of (c)(2) should be applied on same basis as seventy-day limit of (c)(1)), *cert. denied,* —— U.S. ——, 105 S.Ct. 1355, 84 L.Ed.2d 378 (1985).

Since oral argument in this case, we have issued an opinion that appears to qualify *Horton* in the direction that Librizzi favors. *United States v. Feldman,* 761 F.2d 380, 388–89 (7th Cir.1985). In *Feldman* we held that § 3161(c)(2) is not applicable to a superseding indictment if § 3161(h)(6) is applicable, but that § 3161(c)(2) is applicable in any other case. The superseding indictment in *Feldman* included five wholly new counts. We held that § 3161(c)(2) applied and that it was reversible error for the court to have denied the defendants thirty

days from their appearance on the superseding indictment until the start of trial. Section 3161(h)(6) did not apply, because the original indictment was not formally dismissed, 761 F.2d at 389, and because the offenses charged in the new indictment were not the same as those charged in the original. *Id.* at 390. We distinguished *Horton* on grounds that in *Horton* § 3161(h)(6) did apply.

Section 3161(h)(6) clearly applies to the facts in the instant case as well. The original indictment was dismissed on motion of the government, and the offenses charged in the superseding indictment are the same as those charged in the original. Thus under the principles of *Feldman,* § 3161(c)(2) does not apply. We shall not overrule *Horton,* as limited by *Feldman,* because we see no reason why the defendants should be given a new thirty-day period to prepare when the superseding indictment charges the same offenses as the original.[43]

It is true that if the defendants had secured the dismissal of the original indictment, then under § 3161(d)(1) they would have received a new thirty-day minimum period until trial, even though the superseding indictment charged the same offenses. This appears anomalous to us, and it may have resulted from Congress's failure to notice, when it inserted subsection (c)(2) into the statute in 1979, that (c)(2) would be picked up by the pre-existing cross-reference to subsection (c) in § 3161(d)(1). We have previously remarked that the Speedy Trial Act is an unsatisfactory piece of draftsmanship,

---

**42.** Section 3161(c)(2) was added to the Speedy Trial Act in the amendments of 1979, Pub.L. No. 96–43, § 2, 93 Stat. 327, 327 (1979). Former subsection (c) was also amended and renumbered (c)(1). For a discussion of the legislative history, see *United States v. Mers,* 701 F.2d 1321, 1332–34 (11th Cir.), *certs. denied, Ferrante v. United States,* 464 U.S. 991, 104 S.Ct. 481, 482, 78 L.Ed.2d 679 (1983).

**43.** Our holding today is in harmony with the Judicial Conference guidelines on the Speedy Trial Act.

In the opinion of the Committee, the [thirty-day] period does not begin to run anew when

superseding indictments are filed in circumstances in which the seventy-day time limit is determined by reference to the original indictment or information. See Section 3161(h)(6).... In all of these situations, the trial court should use its scheduling discretion to ensure that the defense had time to prepare in the circumstances of the particular case. Committee on the Administration of the Criminal Law of the Judicial Conference of the United States, *Guidelines to the Administration of the Speedy Trial Act of 1979* 14 (1981).

*United States v. Tibboel,* 753 F.2d 608, 610 (7th Cir.1985), a point that is further confirmed today.

### V. Conclusion

For the reasons stated above, the convictions of Frank P. Balistrieri, Steve DiSalvo, and Dennis Librizzi are

AFFIRMED.